IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

_____

EVAN BEINE and
MICHELLE BEINE

                                                           Civil Action No. 25-cv-432

        Plaintiffs,

    v.

CHILDREN'S HOSPITAL AND HEALTH SYSTEM, INC.,
CHILDREN'S HOSPITAL OF WISCONSIN, INC.,
THE MEDICAL COLLEGE OF WISCONSIN, INC.,
HILLARY W. PETSKA, M.D.,
MICHAEL N. LEVAS, M.D.,
KEVIN P. BOYD, D.O.,
MATTHEW R. PLUNK, M.D.,
HEATHER L. LISKO, N.P., and
DEBORAH A. BRETL, N.P.,

        Defendants.

_____

## **<u>COMPLAINT</u>**

Plaintiffs Evan Beine and Michelle Beine (the "Beines"), by their attorneys Gimbel,

Reilly, Guerin & Brown LLP, complain of the Defendants Children's Hospital and Health

System, Inc., Children's Hospital of Wisconsin, Inc., The Medical College of Wisconsin,

Inc., Hillary W. Petska, M.D., Michael N. Levas, M.D., Kevin P. Boyd, D.O., Matthew R.

Plunk, M.D., Heather L. Lisko (née Marschall), N.P., and Deborah A. Bretl, N.P., and

allege as follows:

1

## VENUE AND JURISDICTION

1.      This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367.

2.       Venue is proper under 28 U.S.C. § 1391(b). At least one Defendant resides in this judicial district and the events giving rise to the claims asserted here all occurred within this district.

## PARTIES

3.      Plaintiffs Evan Beine and Michelle Beine are adult citizens and residents of the State of Wisconsin, with a permanent residence located at 609 Highview Drive, Slinger, WI 53086.

4.      At all times relevant to the events described below, Children's Hospital and Health System, Inc. ("CHHS") was a Wisconsin corporation that ran, owned, operated, managed, and controlled hospitals and clinics throughout Wisconsin, including at 8915 W. Connell Ct., Milwaukee, Wisconsin, Milwaukee County.

5.      At all times relevant to the events described below, Children's Hospital of Wisconsin, Inc. ("CHW"), was a Wisconsin corporation that ran, owned, operated, managed, and controlled hospitals and clinics throughout Wisconsin, including, but not limited to, at 8915 W. Connell Ct., Milwaukee, Milwaukee County, Wisconsin, 9000 W. Wisconsin Ave., Milwaukee, Milwaukee County, Wisconsin, and 999 N. 92nd St., M.S. C760, Wauwatosa, Milwaukee County, Wisconsin.

6.      At all times relevant to the events described below, The Medical College of Wisconsin, Inc. ("MCW") was a Wisconsin non-stock corporation that employed medical

doctors, advance practice nurse practitioners, physician assistants, registered nurses, medical technicians, administrators, and various other people to run its business and work in the medical healthcare system within Wisconsin.

7.     Defendants CHHS, CHW, and MCW are hereinafter collectively referred to as the "Entity Defendants."

8.     At all times relevant to the events described below, Hillary W. Petska, M.D. ("Dr. Petska") was licensed to practice medicine in the state of Wisconsin, and was an employee, agent, or an apparent agent of one or all of the Entity Defendants.

9.     At all times relevant to the events described below, Michael N. Levas, M.D. ("Dr. Levas") was licensed to practice medicine in the State of Wisconsin, and was an employee, agent, or apparent agent of one or all of the Entity Defendants.

10.    At all times relevant to the events described below, Kevin P. Boyd, D.O. ("Dr. Boyd") was licensed to practice medicine and radiology in the State of Wisconsin, and was an employee, agent, or apparent agent of one or all of the Entity Defendants.

11.    At all times relevant to the events described below, Matthew R. Plunk, M.D. ("Dr. Plunk") was licensed to practice medicine in the State of Wisconsin, and was an employee, agent, or apparent agent of one or all of the Entity Defendants.

12.    At all times relevant to the events described below, Heather L. Lisko, N.P. ("Lisko") was a licensed nurse practitioner in the State of Wisconsin, and was an employee, agent, or apparent agent of one or all of the Entity Defendants.

13.     At all times relevant to the events described below, Deborah Bretl, N.P. ("Bretl") was a licensed nurse practitioner in the State of Wisconsin, and was an employee, agent, or apparent agent of one or all of the Entity Defendants.

14.     Defendants Dr. Petska, Dr. Levas, Dr. Boyd, Dr. Plunk, Lisko, and Bretl are hereinafter collectively referred to as the "Individual Defendants." At all times relevant to the events described below, each of the Individual Defendants acted under color of law and within the scope of their employment.

**FACTS COMMON TO ALL CLAIMS**
*The Visit to Children's Hospital of Wisconsin November 21, 2020*

15.     On or about November 21, 2020, the Beines were at home with their 5-week-old baby, P.B.

16.     Mr. Beine was in one room with P.B. changing his diaper while Mrs. Beine was in the room next door, pumping breast milk for P.B.'s next feed.

17.     As Mr. Beine changed P.B.'s diaper he lifted the infant's legs so that he could clean his bottom and slide the diaper beneath him. At this time, Mr. Beine heard a "popping sound" and P.B. began to cry.

18.     The Beines immediately called P.B.'s pediatrician at Advocate Aurora Health and were advised by the on-call physician that there was likely nothing wrong and that they could wait and see how things continued before bringing P.B. in for any medical treatment.

19.     The Beines remained concerned about the popping sound, so they decided to take P.B. to an Urgent Care Clinic.

20.     However, Urgent Care staff directed the Beines to Children's Hospital of Wisconsin since P.B. was too young to be treated at the facility.

21.     Once at CHW, staff administered x-rays, took blood work, and the matter was immediately investigated by the child advocacy team at CHW as a potential incident of child abuse.

22.     CHW staff then contacted the Milwaukee Police Department and officers were dispatched to the hospital to begin a criminal investigation.

23.     Dr. Levas informed the Milwaukee Police Officers that P.B. had a long bone fracture to his left leg, which Dr. Levas reported was a "spiral" fracture.

24.     Dr. Levas also informed police that P.B. had four previous fractures in his legs that were now healed and that P.B.'s injury to his long bone was not consistent with Mr. Beine's story.

25.     Dr. Levas reported that, in his professional opinion, a large amount of force was necessary to create the four fractures allegedly observed on P.B.'s x-rays.

26.     Dr. Levas' opinions and statements to police were based upon the findings and interpretation of the radiologist, Dr. Boyd.

27.     Dr. Boyd reported the following in P.B's medical records:

a)      Acute, oblique minimally displaced fracture of the mid left tibial diaphysis;

b)      Subacute appearing, healing metaphyseal corner fracture of the proximal right tibial metaphysis;

c)      Additional metaphyseal fractures suggested of the medial distal right and left tibial metaphyses.

5

28.     Based upon Dr. Boyd's findings, Lisko, in her role as a nurse practitioner in CHW's child abuse unit, conducted a "Child Advocacy Consultation" and drafted a corresponding report of her findings.

29.     Lisko reported that P.B. "has classic metaphyseal lesions or CMLs, which are also sometimes referred to as 'corner' or 'bucket handle' fractures. This type of fracture occurs near the end of long bones (metaphysis) and usually affects younger children (e.g., infants or toddlers). The mechanism of a CML is severe force traction and/or torsion such as a 'yank and twist' to the extremity or forceful acceleration/deceleration of the extremities as might occur during violent shaking/slamming. These types of fractures do not occur during the routine care, handling, or activity of a healthy infant. CML's are highly specific for inflicted trauma in a non-mobile child and there is no history of accidental trauma that would explain this injury. This injury is therefore highly concerning for child physical abuse."

30.     Lisko also stated that a bruise on P.B.'s left leg, at the site of the long bone tibial fracture that P.B. was being treated for, supports her conclusion that P.B. had been physically abused and noted that "infants with unexplained bruising are at risk for more serious injury and/or death."

31.     Lisko opined in her report that the dating of bruises can be difficult, and it is not recommended to determine when a bruise originally presented.

32.     Lisko did not consider the fracture as the cause of the bruising, though the fracture and bruise were in the same location, and concluded without any investigation into P.B.'s health history that the bruising was generally related to abuse.

6

33.     If either Lisko or CHW staff had reviewed P.B.'s health records, they would have known that P.B. had been seen by his pediatrician on October 7, 2020, October 12, 2020, October 13, 2020, October 19, 2020, October 30, 2020, November 9, 2020, and November 20, 2020, and not one of those examinations revealed "ecchymosis" or any observed bruising on the child. To the contrary, the notes from the well-child check on November 20, 2020, (less than 24 hours prior to the injury to the child), state P.B.'s skin was "pink, warm, [with] no rashes, [and] no ecchymosis."

34.     Dr. Petska signed off on Lisko's opinion detailed in paragraphs 28 through 32.

35.     Dr. Petska never saw P.B. or spoke with the Beines before signing off on Lisko's report.

36.     CHW staff communicated all diagnoses and opinions from November 21, 2020, and the days that followed to police without the benefit of any follow-up x-rays or results of advanced blood and genetic testing.

37.     As a result of the haphazard reports, findings, and opinions made by Dr. Petska, Dr. Levas, Dr. Boyd and Lisko, Mr. Beine was arrested at the hospital on November 21, 2020.

38.     Subsequent to his arrest, Mr. Beine was later charged with felony child abuse on December 15, 2020, in Milwaukee County Circuit Court Case Number 2020CF4472.

*Child Protective Services Investigates and Questions CHW's Conclusions*

39.     While the Beines and P.B. were still at the hospital on November 21, 2020, CHW staff contacted Milwaukee Child Protective Services ("CPS") to begin their own investigation into alleged child abuse.

40.     As a part of the CPS involvement, Mrs. Beine was not allowed to see P.B. unsupervised, and Mr. Beine was prohibited from engaging in P.B.'s care in any capacity and was prohibited from having any physical contact with his son without CPS supervision.

41.     As a result, the Beines were forced to move in with Mrs. Beine's parents to help facilitate the mandatory supervision and care for P.B.

42.     After several weeks of monitoring, CPS concluded that the allegations of physical abuse by Mr. Beine were unsubstantiated.

43.     Specifically, CPS concluded that they were only "able to confirm Mr. Beine caused one break," and that even that injury to the long bone "was not caused intentionally or seemingly even recklessly."

44.     CPS's conclusion was reached in January 2021, after monitoring the Beines and after its review of the follow-up testing by CHW, which indisputably could not confirm that the other observed abnormalities were in fact fractures or had been caused by any person, let alone by Mr. Beine.

45.     CPS's investigation revealed nothing to support a finding that the Beines were impatient, not aligned with the child, had any impulse control issues, or had any ill intent toward P.B.

46.     As a result, CPS closed its investigation, concluding that there was no support for the finding that Mr. Beine or anyone else had abused P.B. in any way.

*Follow-Up Testing Reveals Several Abnormalities & Other Experts Disagreement with CHW's Findings*

47.     The results from P.B.'s blood tests that were taken in November at CHW revealed that P.B. had an elevated parathyroid hormone level (PTH) of 67.5, a level that is well above the normal range for infancy of 7.5-53.5 pg/mL.

48.     Additionally, the testing revealed that P.B.'s blood had lower than normal levels of Factor IX, a protease that impacts the body's ability to clot blood.

49.     Both testing results are relevant to the issue of bruising and the presence of metaphyseal abnormalities.

50.     However, these results did not alter the findings of CHW staff, who continued to work with the Milwaukee County District Attorney's Office to pursue a criminal conviction against Mr. Beine.

51.     On November 30, 2020, and December 14, 2020, P.B. was seen for follow-up appointments by radiology at CHW.

52.     In both corresponding records, the reviewing radiologists are significantly less certain of the initial diagnosis of the three alleged corner metaphyseal lesions or fractures, noting:

a)      Previously identified metaphyseal fracture of the right proximal tibia has decreased in conspicuity, suggestive of further healing of a subacute injury; and

b)      Similar appearance of irregularity of the bilateral distal tibial metaphysis which remains concerning for previous metaphyseal fracture.

9

53.     The reviewing radiologist reported that the findings regarding the right proximal tibia can "suggest" healing of a subacute injury, undermining Dr. Boyd's conclusive determination that this abnormality was confirmed to be a fracture on November 21, 2020 – which led to Mr. Beine's arrest.

54.     Lisko was called upon to review the new findings and the conflicting conclusions from radiology.

55.      Lisko concluded, without explanation, that the plainly less certain conclusions of the two subsequent CHW radiologists performing the repeat skeletal surveys "[do] not impact the level of suspicion of abuse regarding the initial injury since [the repeat surveys are] performed to clarify initial injuries and detect new injuries," not with the purpose of confirming the initial diagnosis.

56.     Lisko stood by her initial assessment of the case and again issued the legal conclusion that P.B. "has been physically abused."

57.     Dr. Petska did not provide her own assessment of the case or findings but instead signed off on the narrative and conclusions of Lisko without ever treating P.B., talking to the Beines, or considering alternative hypotheses.

*A Visit to American Family Children's Hospital Nephrology Department and Second Opinions*

58.     After Mr. Beine was charged, Mrs. Beine began doing research into how her own scoliosis diagnosis and an extensive family history of bone disorders and back issues may be linked to a genetic abnormality.

59.     Mrs. Beine began looking into a second opinion and potential causes for the abnormalities noted on the x-rays performed by CHW and MCW.

10

60. Mrs. Beine's research led her to the UW Health System ("UW Health") and the American Family Children's Hospital Nephrology Department.

61. Upon review of the CHW records, the physicians at UW Health noted that the x-ray report notes that there were "possible metaphyseal fractures bilaterally," but that this was "less clear" in their view. The reviewing physician verbally confirmed with P.B.'s mother that he did not agree with the definitive diagnosis.

62. The UW Health physicians also noted that the distal metaphysis in the lower extremities were of "unclear etiology and could be normal variants" based on their appearance on repeat scans from December 2020.

63. The visit notes also reflect that P.B. has slightly blue/grey sclera of the eyes, which can be seen in cases of osteogenesis imperfecta, but that there were not other traditional hallmarks of that condition.

64. The UW Health physician explained that there were two potential causes related to the injuries sustained by P.B., either: (1) there was more force used than what would typically be done in a diaper change, or (2) there was an underlying issue with P.B.'s bones.

65. As a result of this hypothesis, a genetic blood test was ordered to test for skeletal dysplasia conditions. The genetic panel revealed an intronic FN1 variant of uncertain significance, a variant associated with bone weakness and unexplained fractures.

11

66. This conclusion by UW Health was reached after staff at CHW and MCW considered no alternative hypothesis to explain the abnormalities and ordered no additional testing.

67. Instead, CHW only used subjective, non-medical conclusions from a nurse practitioner that the injuries and abnormalities could only be explained by child abuse.

*The Opinion of Dr. Christopher Sullivan, Director of Pediatric Orthopedics and Scoliosis at Comer Children's Hospital, The University of Chicago Medicine*

68. Christopher Sullivan, M.D. ("Dr. Sullivan") is a board-certified orthopedic surgeon of the Pediatric Orthopedic Society of North America, practicing out of The University of Chicago Medicine Corner Children's Hospital.

69. Dr. Sullivan composed a report and an associated PowerPoint presentation detailing how P.B.'s alleged corner metaphyseal lesions are not in fact representative of an injury or abuse of any kind because all "subsequent radiographs fail to show any fracture healing of the alleged injuries."

70. Dr. Sullivan's report opined that "there is no evidence of fracture healing at the proximal or distal ends of the tibia on either side. If these were fractures, there would be evidence of fracture healing on the repeat x-rays. Therefore, the 'corner metaphyseal lesions' are not fractures at all".

71. Dr. Sullivan also noted in his report that the skeletal survey and x-rays revealed other signs associated with metabolic bone disease in infancy and the weakening of bones.

12

72. Signs of "cupping of the anterior ribs" were seen in the x-rays taken while P.B. was at CHW. "Cupping" of the ribs is associated with rickets and other bone density disorders in infancy.

73. Dr. Sullivan concluded his report with the following:

a) P.B. "has a single tibial shaft fracture which is non-displaced, which means it looks like a crack in a china plate. This fracture was produced by the minimal amount of force necessary and no more, or else the fracture would have been displaced, which means the two sides of the fracture would have been apart from each other. There were no other injuries.

b) Mr. Beine's explanation of hearing a pop when changing diapers is a very plausible explanation for this injury and is consistent with the fracture pattern.

c) So P.B had one injury, explained by observed activities without any other head, neurologic or abdominal injury or fractures. The reported other fractures made it seem suspicious, but there are no other additional fractures to explain. The workup that was triggered by the "overcall" on the additional fractures was all entirely negative, including demonstrating that no other fractures existed.

*The Opinion of Dr. Marvin Miller, Department of Medical Genetics & Birth Defects at Dayton Children's Hospital*

74. Marvin Miller, M.D. ("Dr. Miller") is a Yale-trained pediatric geneticist who is board-certified in the fields of pediatrics and medical genetics.

75. Dr. Miller conducts research on pediatrics, bone disorders, pediatric and maternal genetics and a variety of other topics.

76. Dr. Miller reviewed the medical records of both P.B and Mrs. Beine.

77. Dr. Miller took note of the previous records of P.B.'s pediatrician, noting that there were no bruises or signs of child abuse reported on any previous well checks.

13

78. Dr. Miller also made note that the subsequent testing conducted by U.W. Health determined that P.B. was identified to have a genetic bone abnormality on the Invite 150 Gene Panel.

79. Based on his observations, Dr. Miller opined that there were several identifying characteristics of metabolic bone disease found in P.B, including:

    a) "Bone in bone" of the vertebrae;

    b) Cupped ribs;

    c) Sclerosis of proximal femurs;

    d) Healing of a CML with no callus formation.

80. Dr. Miller pointed out that Lisko flatly ignored diagnostically relevant information in making her report when she wrote "CML fractures associated with birth injury are generally only seen in traumatic deliveries of large for gestational [age] infants."

81. P.B. was large for gestational age and weighed nearly 10 pounds at birth.

82. Dr. Miller took issue with Lisko's legal conclusion that P.B. "has been physically abused," pointing out that Lisko's "diagnosis" appeared to be solely based on the conclusion that there were three alleged CMLs, when peer reviewed publications have demonstrated that these abnormalities are not specific for trauma or child abuse and can in fact be signs of metabolic bone disease in infancy.

83. Lisko, Dr. Petska, Dr. Boyd, Dr. Levas, Dr. Plunk, Bretl nor any of the Entity Defendants ever considered a metabolic bone disease.

14

*The Opinion of Dr. Susan Gootnick, Board Certified Radiologist Since 1977*

84.     Susan Gootnick, M.D. ("Dr. Gootnick") is a board-certified radiologist with more than 48 years of diagnostic and teaching experience.

85.     Dr. Gootnick reviewed the reports from CHW, as well as P.B. and Mrs. Beine's medical history in preparation for forming her opinion.

86.     Dr. Gootnick detailed in her report that P.B. was born at nearly ten pounds to a mother with notably low vitamin D levels.

87.     Dr. Gootnick concluded that the skeletal survey demonstrated evidence consistent with metabolic bone disease in infancy.

88.     Dr. Gootnick opined that the CMLs identified previously as "fractures" were not fractures but instead evidence of metabolic bone disease or healing from a rickets diagnosis.

89.     Dr. Gootnick concluded that "there is no evidence of child abuse but there is extensive radiographic evidence of metabolic bone disease most commonly rickets in the neonatal period."

90.     None of the Individual Defendants or the Entity Defendants considered a metabolic bone disease or rickets.

*The Opinion of Dr. Susanna Sorrentino*

91.     Susanna Sorrentino, M.D. ("Dr. Sorrentino"), a physician at Medical Genetics of Nevada, reviewed P.B.'s medical history, Mrs. Beine's medical history, the medical reports from CHW, as well as other health and physical attributes of P.B.

15

92. Dr. Sorrentino discovered that P.B. suffers from a genetic abnormality to the FN1 gene – specifically intronic, heterozygous variant.

93. Dr. Sorrentino issued a report detailing her findings and P.B.'s ultimate diagnosis of Spondylometaphyseal Dysplasia, Corner Type, a disease that results in bone weakening, unexplained "corner fracture like lesions," and a variety of other symptoms that often resolve in childhood.

94. All of the above symptoms observed by Dr. Sorrentino and others were present in November 2020 when P.B. was seen at CHW.

95. Expressions of this type of mutation were observed by Dr. Sorrentino throughout P.B.'s maternal familial side, including his mother sharing the same genetic mutation of the FN1 gene.

96. Based on the totality of the information reviewed, Dr. Sorrentino concluded that it is more likely than not that the injury to P.B.'s tibia and the identified irregularities were symptoms of that disorder and not the result of abuse.

*CHW Staff Continued to Assist with Mr. Beine's Prosecution Despite Conflicting Expert Opinions*

97. The reports from four individual physicians were shared with the Entity Defendants, Individual Defendants and prosecution.

98. Despite the opinions of several experts and P.B.'s diagnosis of a genetic condition related to the observed abnormalities, both Dr. Petska and Dr. Boyd continued to assist the prosecution with the pursuit of a conviction against Mr. Beine.

99. On May 4, 2022, the charging prosecutor, Attorney Katherine Seelow, wrote in an electronic communication that she had spoken with Dr. Petska and Dr. Boyd about their findings related to child abuse.

100. During this communication, Dr. Petska and Dr. Boyd provided opinions regarding the injuries to P.B. and conclusions that Mr. Beine must have abused his son rather than that the abnormalities could be related to a genetic condition or metabolic bone disorder.

101. Dr. Petska and Dr. Boyd collaborated with Attorney Seelow to prepare demonstrative exhibits at the State's request for prosecution.

102. Dr. Petska and Dr. Boyd refused to acknowledge the new evidence and medical records not previously considered by Individual Defendants and Entity Defendants.

103. Instead, Dr. Petska and Dr. Boyd attempted only to protect their initial incorrect and uninformed conclusions.

104. Dr. Petska and Dr. Boyd reviewed the expert findings for the prosecution, preparing rebuttals to the other physicians, while failing to consider the entirety of the records from the November and December 2020 treatment provided by CHW, as well as P.B.'s past medical records and treatment for low Vitamin D and genetic abnormalities.

105. Further, it was discovered later in the defense investigation that Dr. Petska and Dr. Boyd continued their assistance with the prosecution without reviewing all relevant evidence necessary for providing an appropriate and accurate diagnosis in child

abuse matters as set forth in the treatise guiding investigations, *Diagnostic Imaging of Child Abuse*, Third Edition, Edited by Dr. Paul K. Kleinman.

106.     During the investigation into the criminal case, the defense conducted telephonic interviews with Dr. Boyd and Dr. Plunk, on September 28, 2022.

107.     During this telephone call, Dr. Boyd revealed that despite his assistance to the prosecution to "debunk" the conclusions of the several consulting experts, he had never personally reviewed the follow up radiology testing CHW performed in December 2020 to determine if there was evidence of healing injuries.

108.     Dr. Boyd agreed that it was possible that a genetic abnormality could be related to the appearance of bone fractures, but that this was generally outside of his expertise.

109.     Dr. Boyd confirmed that he had not been aware of the findings from the repeat scans while he continued to draw his own conclusions in support of Mr. Beine's prosecution.

110.     Instead, Dr. Boyd stood by his initial belief that the injury must have been caused by intentional infliction of child abuse, despite the fact that the repeat scans performed at CHW showed that abnormalities did not exhibit signs of healing associated with fractures. Rather, the abnormalities persisted with little change, confirming that they were not fractures.

111.     Dr. Boyd, Dr. Petska, and the Entity Defendants continued recklessly representing to law enforcement and the prosecution team that P.B. undoubtedly had bone fractures.

18

112.    The ongoing participation and unwavering assistance to the prosecution by CHW and MCW staff constitutes medical malpractice, libel, and slander of Mr. Beine and his character.

## PLAINTIFFS' DAMAGES

113.    As a result of Defendants' misconduct, the Beines suffered a series of catastrophic harms, including some of the most severe harms imaginable – the unraveling of their family, the devastation of the Beine's reputation, and the heartbreaking loss of precious moments with their newborn child.

114.    The impact of the misdiagnosis and rush to judgement by CHW and MCW staff will have a lasting effect on the Beines and tarnish their reputation in the community forever.

115.    Within hours of seeking treatment for their young son, Mr. Beine was in custody facing felony charges and was under investigation by Child Protective Services.

116.    In the initial aftermath of the visit, Mr. Beine was not allowed to touch, hold, or provide care for P.B.

117.    This caused the Beines to uproot from their home and move in with family in order to adhere to the new restrictions.

118.    The Beine family, having had to move in with family members to comply with CPS restrictions resulting from the early misdiagnosis, began paying rent to family on top of their mortgage, requiring that they rent out their own home to make ends meet.

119.    Faced with frequent medical appointments and the need to obtain treatment for P.B., who continued to struggle with a serious condition that went

19

undiagnosed for far too long due to the lack of proper care by CHW and MCW, Mrs. Beine struggled upon her return to work after maternity leave.

120.    The Defendants' conduct significantly impacted Mrs. Beine's immediate earning potential and ultimately led to her termination from her position when the time and attention away to support P.B. and the pending legal case became too much.

121.    Expenses and costs continued to be incurred for the Beines, as they were forced to retain private counsel to handle the criminal case before its ultimate dismissal, and had to hire several expert doctors to review the findings of CHW and MCW.

122.    The misdiagnosis and lack of proper care for P.B. has likewise impacted Mr. Beine's career, as he is employed as a safety engineer which requires him to have specific security clearances for certain job sites.

123.    As a result of the felony charge against Mr. Beine, he could not obtain the necessary security clearances for several job sites, which limited his ability to exercise his full employment duties.

124.    This caused Mr. Beine to lose out on job opportunities and to reveal the child abuse investigation to his employer, further damaging his reputation in the community and inhibiting his career ambitions.

125.    Despite the dismissal of criminal charges, the charges remain a matter of public record and are included in any criminal background check, forever impugning Mr. Beine's once stellar reputation in the community.

20

126.     Family, friends, employers, and associates all became aware of the legal proceedings pending against Mr. Beine, as well as the allegations that he had traumatically and violently abused his son.

127.     These allegations and the rushed conclusions of CHW and MCW staff were repeatedly discussed in the public forum of the circuit court, causing substantial damage to Mr. Beine and his reputation in the community.

<u>COUNT I</u>
**42 U.S.C. § 1983 – Due Process – All Defendants**

128.     Plaintiffs incorporate each and every paragraph of this Complaint as if fully restated herein.

129.     The Beines have a liberty interest in their existing and future familial relationship with P.B.

130.     In the manner described more fully above, the Individual Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, acted to deprive the Beines of their liberty interest in their familial relationship with P.B., without due process of law and in violation of their rights secured by the U.S. Constitution.

131.     The Individual Defendants' misconduct described in this Count was undertaken pursuant to the policies and practices of one or more of the Entity Defendants.

132.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiffs' constitutional rights.

133.    As a result of the Defendants' misconduct described in this Count, Plaintiffs were deprived of their familial relationship with P.B. and suffered great mental and emotional anguish and other grievous and continuing injuries and damages as set forth above.

## COUNT II
### 42 U.S.C. § 1983 – Equal Protection ("Class of One") – All Defendants

134.    Plaintiffs incorporate each and every paragraph of this Complaint as if fully restated herein.

135.    In the manner described more fully above, the Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, treated Plaintiffs less favorably and afforded them fewer rights, privileges, and procedural protections than similarly situated individuals were treated.

136.    In doing so, the Individual Defendants acted with illegitimate animus towards the Beines.

137.    There was no rational basis for the manner in which the Defendants treated the Beines less favorably.

138.    The Individual Defendants' misconduct described in this Count was undertaken pursuant to the policies and practices of one or more of the Entity Defendants.

139.    The misconduct described in this Count was undertaken pursuant to the policies and practices of one or more of the Entity Defendants.

140.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to the Beines' constitutional rights.

141.     As a result of the Defendants' misconduct described in this Count, the Beines were deprived of their familial relationship with P.B. and suffered great mental and emotional anguish and other grievous and continuing injuries and damages as set forth above.

## COUNT III
### 42 U.S.C. § 1983 – Failure to Intervene – All Defendants

142.     Plaintiffs incorporate each and every paragraph of this Complaint as if fully restated herein.

143.     In the manner described more fully above, during the Constitutional violations described above, all of the Individual and Entity Defendants stood by without intervening to prevent the misconduct.

144.     The Individual Defendants' misconduct described in this Count was undertaken pursuant to the policies and practices of one or more of the Entity Defendants.

145.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to the Beines' constitutional rights.

146.     As a direct and proximate result of the Individual Defendants' failure to intervene to prevent the violation of the Beines' constitutional rights, Plaintiffs were deprived of their familial relationship with P.B. and suffered great mental and emotional anguish and other grievous and continuing injuries and damages as set forth above.

23

## COUNT IV
## 42 U.S.C. § 1983 – Supervisory Liability – Dr. Petska

147.     Plaintiffs incorporate each and every paragraph of this Complaint as if fully restated herein.

148.     The constitutional injuries complained of herein were proximately caused by a pattern and practice of misconduct, which occurred with the knowledge and consent of those of the Individual Defendants who acted in a supervisory capacity, such that these Defendants personally knew about, facilitated, approved, and condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation by their actions or by their deliberately indifferent failure to act.

149.     As a direct and proximate result of the misconduct referenced above, the Beines were deprived of their familial relationship with P.B. and suffered great mental and emotional anguish and other grievous and continuing injuries and damages as set forth above.

## COUNT V
## Negligence – All Defendants

150.     Plaintiffs incorporate each and every paragraph of this Complaint as if fully restated herein.

151.     At all times relevant to the events described above, the physicians, advance practice nurse practitioners, physician assistants, registered nurses, administrators, employees, agent, and apparent agents of Entity Defendants had a duty to exercise ordinary care to refrain from any act which will cause foreseeable harm to the Beines, and to refrain from any act which creates an unreasonable risk to the Beines.

24

152.    At all times relevant to the events described above, each Individual Defendant had a duty to exercise ordinary care to refrain from any act which will cause foreseeable harm to the Beines, and to refrain from any act which creates an unreasonable risk to the Beines.

153.    The Defendants breached their duty of ordinary care in one or more of the following ways:

a.    Negligently conducted a child welfare exam in violation of policies and procedures;

b.    Negligently transferred the care of P.B. to a nurse practitioner rather than to a board-certified child abuse physician;

c.    Improperly "identified" fractures found in P.B's skeletal scan;

d.    Misinterpreted abnormal radiology scans;

e.    Misinterpreted abnormal bloodwork as normal;

f.    Failed to get the appropriate specialties or consultations prior to concluding that child abuse had occurred.

g.    Failed to consider Mrs. Beine's family medical history;

h.    Failed to obtain Mrs. Beine's medical history;

i.    Made allegations of abuse on the basis of medical findings tainted by one or more of the above failures;

j.    Removed P.B. from Mr. Beine's care on the basis of medical findings tainted by one or more of the above failures; and

k.    Temporarily terminated the Beines normal familial relationship with P.B. on the basis of medical findings tainted by one or more of the above failures.

154.    As a result of the Defendants' misconduct described in this Count, the Beines were deprived of their familial relationship with P.B. and suffered great mental

25

and emotional anguish and other grievous and continuing injuries and damages as set forth above.

## COUNT VI
### Willful and Wanton Misconduct – All Defendants

155.    Plaintiffs incorporate each and every paragraph of this Complaint as if fully restated herein.

156.    At all relevant times, each Defendant's reckless conduct resulted in Defendants acting with malicious intent towards Plaintiffs.

157.    Defendants acted with an intentional disregard for the rights of the Beines.

158.    At all times relevant to the events described above, the physicians, nurse practitioners, physician assistants, registered nurses, administrators, employees, agents, and apparent agents of the Entity Defendants had a duty to not intentionally disregard the rights of the Beines, to refrain from any act which will cause foreseeable harm to Plaintiffs, and to refrain from any act which creates an unreasonable risk to the Beines.

159.    At all times relevant to the events described above, each of the Individual Defendants had a duty to not intentionally disregard the rights of the Beines, to refrain from any act which will cause foreseeable harm to the Beines, and to refrain from any act which creates an unreasonable risk to the Beines.

160.    The Defendants breached their duty of care in one or more of the following ways:

a)    Willfully, wantonly, and with reckless disregard for the rights of the Beines, conducted a child welfare exam in violation of policies and procedures;

26

b)      Purposely transferred the care of P.B. to a nurse practitioner rather than a board-certified child abuse physician;

c)      Willfully, wantonly, and with reckless disregard for the rights of the Beines, improperly "identified" fractures in P.B.'s skeletal scan;

d)      Willfully, wantonly, and with reckless disregard for the rights of the Beines, misinterpreted abnormal bloodwork as normal;

e)      Willfully, wantonly, and with reckless disregard for the rights of the Beines, failed to consider Mrs. Beine's medical history or obtain her medical records;

f)      Willfully, wantonly, and with reckless disregard for the rights of the Beines, made allegations of abuse on the basis of medical findings tainted by one or more of the above failures;

g)      Willfully, wantonly, and with reckless disregard for the rights of the Beines, continued its allegations of child abuse and assisted state prosecution despite the reports of several independent physicians finding the contrary;

h)      Willfully, wantonly, and with reckless disregard for the rights of the Beines, removed P.B. from Mr. Beine's care;

i)      Willfully, wantonly, and with reckless disregard for the rights of the Beines, temporarily terminated the Beines familial relationship with P.B.

161.    As a result of the Defendants' misconduct described in this Count, the Beines were deprived of their familial relationship with P.B. and suffered great mental and emotional anguish and other grievous and continuing injuries and damages set forth above.

## COUNT VII
### Negligent Infliction of Emotional Distress – All Defendants

162.    Plaintiffs incorporate each and every paragraph of this Complaint as if fully restated herein.

163. At all times relevant to the events described above, the physicians, nurse practitioners, physician assistants, registered nurses, administrators, employees, agents, and apparent agents of the Entity Defendants acted without ordinary care or as a person in their conduct described herein.

164. At all times relevant to the events described above, each of the Individual Defendants acted without ordinary care or as a reasonable person in their conduct described herein.

165. All of the conduct described herein by Defendants, a reasonable person would recognize as creating an unreasonable risk of injury to the Beines.

166. As a proximate result of Defendants' negligent conduct, the Beines suffered severe emotional distress and mental anguish as described more fully above.

## COUNT VII
**Intentional Infliction of Emotional Distress – All Defendants**

167. Plaintiffs incorporate each and every paragraph of this Complaint as if fully restated herein.

168. At all times relevant to the events described above, the physicians, nurse practitioners, physician assistants, registered nurses, administrators, employees, agents, and apparent agents of the Entity Defendants intentionally and/or recklessly in their conduct described herein.

169. At all times relevant to the events described above, each of the Individual Defendants acted intentionally and/or recklessly in their conduct described herein.

28

170.    All of the conduct described herein by Defendants was extreme and outrageous.

171.    As a proximate result of Defendants' intentional and/or reckless extreme and outrageous conduct, the Beines suffered severe emotional distress as more fully described above.

**COUNT VIII**
**Tortious Interference – All Defendants**

172.    Plaintiffs incorporate each and every paragraph of this Complaint as if fully restated herein.

173.    At all relevant times, prior to November 2020, Mr. Beine had a reasonable expectation to be able to go to work at all job sites without the fear of being denied because of a felony child abuse charge.

174.    At all times relevant to the events described above, Defendants knew that a felony charge of child abuse would limit Mr. Beine's career opportunities.

175.    Defendants' negligent, willful, wanton, reckless, and false representations related to Mr. Beine resulted in Mr. Beine's denial from several job sites and hindered his professional growth.

176.    Mr. Beine suffered personal and pecuniary damages, and harm to his reputation as a result of the Defendants' tortious interference as more fully described above.

29

## COUNT IX
## Defamation – All Defendants

177. Plaintiffs incorporate each and every paragraph of this Complaint as if fully restated herein.

178. At all relevant times to the events described above, a physician, nurse practitioner, physician assistant, registered nurse, administrator, employee, agent, and/or apparent agent of the Entity Defendants stated that Mr. Beine had abused his child.

179. At all relevant times to the events described above, a physician, nurse practitioner, physician assistant, registered nurse, administrator, employee, agent, and/or apparent agent of the Entity Defendants published the statement that Mr. Beine had abused his child.

180. At all times relevant to the events described above, each of the Individual Defendants stated and/or adopted the statement that Mr. Beine had abused his child.

181. At all times relevant to the events described above, each of the Individual Defendants published the statement that Mr. Beine had abused his child.

182. The statement that Mr. Beine abused his child is false.

183. No recognized privilege exists for any defendant stating that Mr. Beine had abused his child.

184. As a direct and proximate result of the Defendants' actions, Mr. Beine suffered injury of a personal and pecuniary nature including his forever tarnished reputation in the community as more fully described above.

30

## JURY DEMAND

The Beines hereby demand a trial by jury of all issues triable of right to a jury.

WHEREFORE, Plaintiffs, the Beines, seek the following relief:

A.    Compensatory and punitive damages as are available under 42 U.S.C. section 1983 for violation of their constitutional rights.

B.    Plaintiffs' costs, including reasonable attorney fees, as provided by 42 U.S.C. section 1988(b), for violation of their constitutional rights.

C.    Compensatory and Punitive damages in an amount to be determined at trial that will fairly compensate Plaintiffs for their injuries, with respect to all claims.

D.    Costs, disbursements, and reasonable attorney fees incurred in their action.

E.    Any further relief the Court deems just and equitable.

Dated this 20th day of March, 2025.

Respectfully submitted,

GIMBEL, REILLY, GUERIN & BROWN LLP

By:  *Electronically signed by Nicole M. Masnica*
     Nicole M. Masnica
     State Bar No. 1079819
     nmasnica@grgblaw.com
     Zachary T. Wroblewski
     State Bar No. 1119194
     zwroblewski@grgblaw.com
     Attorneys for Plaintiffs Evan and Michelle Beine

POST OFFICE ADDRESS:

330 East Kilbourn Avenue, Suite 1170
Milwaukee, Wisconsin 53202
Telephone:  414/271-1440