IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

EVAN BEINE and
MICHELLE BEINE

Case No. 25-CV-432

Plaintiffs,

v.

CHILDREN'S HOSPITAL AND HEALTH SYSTEM, INC.,
CHILDREN'S HOSPITAL OF WISCONSIN, INC.,
THE MEDICAL COLLEGE OF WISCONSIN, INC.,
HILLARY W. PETSKA, M.D.,
MICHAEL N. LEVAS, M.D.,
KEVIN P. BOYD, D.O.,
MATTHEW R. PLUNK, M.D.,
HEATHER L. LISKO, APNP., and
DEBORAH A. BRETL, APNP,

Defendants.

**AMENDED COMPLAINT**

Plaintiffs Evan and Michelle Beine (the "Beines"), by their attorneys Gimbel, Reilly, Guerin & Brown LLP, complain of the Defendants Children's Hospital and Health System, Inc., Children's Hospital of Wisconsin, Inc., The Medical College of Wisconsin, Inc., Hillary W. Petska, M.D., Michael N. Levas, M.D., Kevin P. Boyd, D.O., Matthew R. Plunk, M.D., Heather L. Lisko, APNP., and Deborah A. Bretl, APNP., and allege as follows:

## VENUE AND JURISDICTION

1. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367.

2. Venue is proper under 28 U.S.C. § 1391(b). At least one Defendant resides in this judicial district and the events giving rise to the claims asserted here all occurred within this district.

## PARTIES

3. Plaintiffs Evan and Michelle Beine are adult citizens and residents of the State of Wisconsin, with a permanent residence located at 609 Highview Drive, Slinger, WI 53086.

4. At all times relevant to the events described below, Children's Hospital and Health System, Inc. ("CHHS") was a Wisconsin corporation that ran, owned, operated, managed, and controlled hospitals and clinics throughout Wisconsin, including at 8915 W. Connell Ct., Milwaukee, Wisconsin, Milwaukee County.

5. At all times relevant to the events described below, Children's Hospital of Wisconsin, Inc. ("CHW"), was a Wisconsin corporation that ran, owned, operated, managed, and controlled hospitals and clinics throughout Wisconsin, including, but not limited to, at 8915 W. Connell Ct., Milwaukee, Milwaukee County, Wisconsin, 9000 W. Wisconsin Ave., Milwaukee, Milwaukee County, Wisconsin, and 999 N. 92nd St., M.S. C760, Wauwatosa, Milwaukee County, Wisconsin.

6. At all times relevant to the events described below, The Medical College of Wisconsin, Inc. ("MCW") was a Wisconsin non-stock corporation that employed medical

doctors, advance practice nurse practitioners, physician assistants, registered nurses, medical technicians, administrators, and various other people to run its business and work in the medical healthcare system within Wisconsin.

7. MCW is affiliated with CHHS and CHW by serving as the academic partner for the two entities with a focus on pediatric care.

8. Defendants CHHS, CHW, and MCW are hereinafter collectively referred to as the "Entity Defendants."

9. At all times relevant to the events described below, the Entity Defendants also ran, owned, operated, managed, and controlled Milwaukee Child Advocacy Center, located at 619 Walnut Street, Milwaukee, Wisconsin.

10. The Entity Defendants implemented the Child Advocacy and Protection Services (CAPS) program in the 1970's, which CHW claims is now the largest hospital based Child Advocacy Center network in the nation.

11. At all times relevant to the events described below, Hillary W. Petska, M.D. ("Dr. Petska") was licensed to practice medicine in the state of Wisconsin, and was an employee, agent, or an apparent agent of one or all of the Entity Defendants. Dr. Petska is a child abuse pediatrics doctor and specializes in child advocacy and child abuse while working at the Milwaukee Child Advocacy Center and the Milwaukee Hospital – Children's Wisconsin.

12. At all times relevant to the events described below, Michael N. Levas, M.D. ("Dr. Levas") was licensed to practice medicine in the State of Wisconsin, and was an employee, agent, or apparent agent of one or all of the Entity Defendants. Dr. Levas is a

pediatric emergency medicine physician at the Milwaukee Hospital – Children's Wisconsin.

13. At all times relevant to the events described below, Kevin P. Boyd, D.O. ("Dr. Boyd") was licensed to practice medicine and radiology in the State of Wisconsin, and was an employee, agent, or apparent agent of one or all of the Entity Defendants.

14. At all times relevant to the events described below, Matthew R. Plunk, M.D. ("Dr. Plunk") was licensed to practice medicine in the State of Wisconsin, and was an employee, agent, or apparent agent of one or all of the Entity Defendants.

15. At all times relevant to the events described below, Heather L. Lisko, APNP ("Lisko") was a licensed nurse practitioner in the State of Wisconsin, and was an employee, agent, or apparent agent of one or all of the Entity Defendants. Lisko specializes in child advocacy and protection services.

16. At all times relevant to the events described below, Deborah Bretl, APNP ("Bretl") was a licensed pediatric nurse practitioner in the State of Wisconsin, and was an employee, agent, or apparent agent of one or all of the Entity Defendants. Bretl specializes in child advocacy and child physical abuse while working with the Milwaukee Child Advocacy Center.

17. Defendants Dr. Petska, Dr. Levas, Dr. Boyd, Dr. Plunk, Lisko, and Bretl are hereinafter collectively referred to as the "Individual Defendants." At all times relevant to the events described below, each of the Individual Defendants acted under color of law and within the scope of their employment.

18. Upon information and belief, Dr. Petska served as Defendant Bretl's supervising physician for child abuse cases.

19. Upon information and belief, Dr. Petska served as Defendant Lisko's supervising physical for child abuse cases.

*Defendants Role as State Actors*

20. At all times relevant to the events described in this Complaint, the Entity Defendants' child advocacy programs and Child Advocacy Center had a formal relationship with each other and the State of Wisconsin and Division of Milwaukee Child Protective Services ("CPS").

21. CPS is a division of the Wisconsin Department of Children and Families ("DCF"), a Wisconsin State Agency.

22. The Entity Defendants formally contracted with CPS to provide medical evaluations for CPS at the Child Advocacy Center operated by the Entity Defendants.

23. The Entity Defendants hired and provided medical professionals to evaluate potential cases of child abuse in conjunction with its contract with CPS through the Child Advocacy Center.

24. According to CHW's website, each Child Advocacy Center "partners with local first responders on cases of suspected child maltreatment".

25. CHW's Child Advocacy Center is accredited by the National Children's Alliance (NCA).

26. As an NCA accredited institution, the Child Advocacy Center is required to develop and maintain a Multidisciplinary Team comprised of medical providers, law

enforcement officers, CPS workers and prosecutors, ensure that children receive necessary medical evaluations related to abuse allegations and have a system for tracking cases to ensure quality and appropriate service.

27. The Entity Defendants' Multidisciplinary Team was comprised of a blend of employees paid directly by the State of Wisconsin, and Entity Defendant Employees paid indirectly by the State of Wisconsin through public funds and granted provided to the Entity Defendants as part of the Child Advocacy Center Contract.

28. Upon information and belief, the Entity Defendants receive annual grants from the Child Abuse and Neglect Prevention Board with funding from the State of Wisconsin, Children's Bureau, Administration for Children and Families and the U.S. Department of Health and Human Services.

29. The Child Abuse and Neglect Prevention board was created by the legislature in 1983 as the lead state agency on child abuse and neglect prevention efforts in Wisconsin, as outlined in Wis. Stat. § 48.982.

30. Upon information and belief, the Entity Defendants' Child Advocacy Centers receive annual VOCA grants from federal funding.

31. Upon information and belief, the Entity Defendants' Child Advocacy Centers receive annual funding and grants through the State of Wisconsin from Wisconsin Act 241 and the State budget and Wisconsin Joint Finance Committee.

32. Upon information and belief, the Entity Defendants' Child Advocacy Centers receive annual funding from the Wisconsin Department of Justice.

33. The Multidisciplinary Team and Child Advocacy Center of the Entity Defendants were engaged in work in furtherance, in support of, and/or in conjunction with various exclusive governmental functions, including the administrative and investigation of suspected child abuse or neglect, and the referral for criminal prosecution in appropriate cases.

34. All of the medical care and medical evaluations described in this Complaint provided by the Individual Defendants were provided in furtherance and support of government functions and were paid for by public funds from contracts between the Entity Defendants and the State of Wisconsin.

35. Therefore, the treatment from the Defendants are under the color of law and are considered state actors.

## FACTS COMMON TO ALL CLAIMS

*The Visit to Children's Hospital of Wisconsin November 21, 2020*

36. On or about November 21, 2020, the Beines were at home with their 5-week-old baby, P.B.

37. Mr. Beine was in one room with P.B. at approximately 8:30 a.m. changing P.B.'s diaper while Mrs. Beine was in the room next door, pumping breast milk for P.B.'s next feed.

38. As Mr. Beine changed P.B.'s diaper he lifted the infant's legs so that he could clean his bottom and slide the diaper beneath him. At this time, Mr. Beine heard a "popping sound" and P.B. began to cry.

39. The Beines immediately called P.B.'s pediatrician at Advocate Aurora Health and were advised by the on-call physician that there was likely nothing wrong and that they could wait and see how things continued before bringing P.B. in for any medical treatment.

40. The Beines remained concerned about the popping sound, so they decided to take P.B. to an Urgent Care Clinic.

41. However, Urgent Care staff directed the Beines to Children's Hospital of Wisconsin since P.B. was too young to be treated at the facility.

42. The Beines arrived to CHW's Emergency Department at approximately 11:32 a.m. on November 21, 2020.

43. Once at CHW, Registered Nurse Devon Balles was assigned to P.B.'s care to perform a pain assessment, acuity/triage, review medications and inspect two "line like" bruises on P.B.'s leg.

44. Following RN Devon's initial assessment Dr. Levas was assigned to P.B.'s care at 12:29 p.m.

45. Dr. Levas then ordered and administered x-rays, took blood work, and the matter was immediately investigated by the child advocacy team at CHW as a potential incident of child abuse.

46. Under Dr. Levas's supervision, Dr. Kenzie contacted Bretl and the Child Advocacy Center at or around 1:23 p.m. to report concerns of potential child abuse.

47. At or around 2:08 p.m. Social Worker Linda Wojtasiak was assigned to P.B.'s care.

48. Wojtasiak then contacted the Wauwatosa Police Department at approximately 2:31 p.m., and officers were dispatched to the hospital to begin a criminal investigation.

49. In making this determination to involve Police, Defendants relied on Dr. Levas's and Dr. Boyd's inappropriate and incomplete examination of P.B. and lacked any legitimate factual basis to suspect abuse.

50. Dr. Levas informed the Milwaukee Police Officers that P.B. had a long bone fracture to his left leg, which Dr. Levas reported was a "spiral" fracture.

51. Dr. Levas also informed Police that P.B. had three previous fractures in his legs that were now healed and that P.B.'s injuries were not consistent with Mr. Beine's story.

52. Dr. Levas reported that in his professional opinion, a large amount of force was necessary to create the four fractures allegedly observed on P.B.'s x-rays.

53. Dr. Levas is not a radiologist and does not have the proper training or authority to read and diagnose x-ray images.

54. Dr. Levas's opinions and statements to Police were based upon the findings and interpretation of the radiologist, Dr. Boyd.

55. Dr. Boyd reported the following in P.B's medical records:

a) Acute, oblique minimally displaced fracture of the mid left tibial diaphysis.
b) Subacute appearing, healing metaphyseal corner fracture of the proximal right tibial metaphysis.
c) Additional metaphyseal fractures suggested of the medial distal right and left tibial metaphysis.

56. Based upon Dr. Levas's false and misleading statement to Police, Evan Beine was arrested and taken into custody by the Wauwatosa Police Department.

57. Dr. Levas's conclusion that a "large amount of force" was needed to create these types of fractures was false and failed to consider alternative hypotheses caused by other medical conditions or bone diseases.

58. Dr. Levas ignored abnormal blood results of vitamin D deficiency when making his report to the Wauwatosa Police Department.

59. P.B. had not been seen or had his records reviewed by staff from the Child Advocacy Team and/or Child Advocacy Center before the Wauwatosa Police Department was called.

*Lisko and Dr. Petska's Abuse Report*

60. Based upon Dr. Boyd's findings and Evan Beine's arrest, the Child Advocacy Center was tasked with evaluating P.B.'s medical records through a "Child Advocacy Consultation".

61. P.B. was not physically seen by any member of the Child Advocacy Team and/or members of the Child Advocacy Center, despite being tasked with generating a written report with a child abuse determination.

62. The Child Advocacy Team assigned Lisko and Dr. Petska to review P.B.'s medical records.

63. Lisko reported that only P.B.'s medical records were reviewed "per protocol".

64. Lisko's purported review of P.B.'s medical records violated the standard of care applicable to her as a nurse practitioner, established standards of care for the evaluation of child maltreatment by the American Academy of Pediatrics, clinical practice guidelines developed by Dr. Petska, and multiple of the Entity Defendants' hospital policies and procedures.

65. Lisko failed to take any steps to obtain or document a complete and accurate patient and family medical history.

66. Lisko failed to correctly interpret bloodwork and bone labs that had been completed for P.B., wrongly interpreting the lab results as "unremarkable".

67. Lisko wrongly concluded P.B. has "no indication of underlying bone disease."

68. Lisko failed to correctly interpret P.B.'s x-rays.

69. Lisko failed to discuss family history with P.B.'s parents to inquire about a family history of bone disease or other relevant diagnoses.

70. Instead, Lisko reported that there was no documented family history of bone disease.

71. This statement from Lisko is misleading, in that it falsely suggested that this information was unavailable. The information was available to Lisko and would have been shared with her if she had spoken with the Beines.

72. Lisko knew that medical information is not complete when a medical history is not obtained directly from the child's caregivers.

73. Despite Lisko's knowledge that she was working with incomplete information and failed to discuss P.B.'s family medical history with Plaintiffs, Lisko completed her clinical documentation stating that P.B. had been abused.

74. This blatant disregard for gathering accurate facts to inform her medical evaluation demonstrates Lisko's reckless disregard for standard medical practice and her deeply biased evaluation that drew the conclusion of abuse without any reasonable basis, and without physically evaluating P.B. or speaking with the Beines.

75. Lisko failed to synthesize the available information about P.B.'s injuries and condition and drew conclusions that were not supported by the totality of that information.

76. Lisko reported that P.B. "has classic metaphyseal lesions or CMLs, which are also sometimes referred to as 'corner' or 'bucket handle' fractures. This type of fracture occurs near the end of long bones (metaphysis) and usually affects younger children (e.g., infants or toddlers). The mechanism of a CML is severe force traction and/or torsion such as a 'yank and twist' to the extremity or forceful acceleration/deceleration of the extremities as might occur during violent shaking/slamming. These types of fractures do not occur during the routine care, handling, or activity of a healthy infant. CML's are highly specific for inflicted trauma in a non-mobile child and there is no history of accidental trauma that would explain this injury. This injury is therefore highly concerning for child physical abuse."

77. Lisko also stated that a bruise on P.B.'s left leg, at the site of the long bone tibial fracture that P.B. was being treated for, supports her conclusion that P.B. had been

physically abused and noted that "infants with unexplained bruising are at risk for more serious injury and/or death."

78. Lisko opined in her report that the dating of bruises can be difficult, and it is not recommended to determine when a bruise originally presented.

79. However, Lisko did not consider the fracture as the cause of the bruising, though the fracture and bruise were in the same location, and concluded without any investigation into P.B.'s health history that the bruising was generally related to abuse.

80. Lisko reported that "infants with unexplained bruising are at risk for more serious injury and/or death. Failure to place this child in a safe environment increases the risk of further harm."

81. The general and template statement about P.B.'s bruising was incorrect and inflammatory.

82. Lisko's statement that the bruising was "unexplained" was also false and misleading, while not considering the fracture itself as the cause.

83. If either Lisko or CHW staff had reviewed P.B.'s health records, they would have known that P.B. had been seen by his pediatrician on October 7, 2020, October 12, 2020, October 13, 2020, October 19, 2020, October 30, 2020, November 9, 2020, and November 20, 2020, and not one of those examinations revealed "ecchymosis" or any observed bruising on the child. To the contrary, the notes from the well-child check on November 20, 2020, (less than 24 hours prior to the injury to the child), state P.B.'s skin was "pink, warm, [with] no rashes, [and] no ecchymosis."

84. Medical providers have no training or authority to predict future harm, nor do they have training or authority to assess the safety of individuals or home environments. Therefore, the statement about "risk of further harm," and the implication that Plaintiffs' home was not a "safe environment" for P.B. lacked any basis in fact and were entirely outside the scope of Lisko and Dr. Petska's medical expertise.

85. These false and misleading statements from Lisko were later used by the Wauwatosa Police Department and District Attorney's Office to further prosecute felony child abuse charges against Evan Beine.

86. Lisko is not a medical doctor.

87. Under Wisconsin law, Lisko is not authorized to practice independently and requires supervision by a licensed physician.

88. Under one or more of the Entity Defendants' policies and procedures that define the scope of practice of advanced practice providers in the Child Advocacy Team department and/or Child Advocacy Center, Lisko requires supervision by a supervising physician in situations where the history, physical examination, or laboratory findings are inconsistent with the clinical presentation, or upon request of the parent or guardian.

89. The Entity Defendants' policies and procedures require that any abnormal findings be discussed with the supervising physician and documented in the patient's chart.

90. As a result of her flawed examination and review of P.B.'s medical records, Lisko reached the inaccurate and entirely unwarranted conclusion that P.B. had been physically abused.

91. Lisko's conclusion that P.B. was physically abused was false.

92. Lisko reported that she spent a total of 60 minutes reviewing P.B.'s medical records.

93. At all relevant times, Dr. Petska was Lisko's supervising physician.

94. Dr. Petska did not add additional comments other than signing and stating: "I reviewed the documentation from this ED visit on 11/21/2020 and agree with the findings and recommendations as documented above."

95. Dr. Petska never saw P.B. or spoke with the Beines before signing off on Lisko's report.

96. CHW staff communicated all diagnoses and opinions from November 21, 2020, and the days that followed, to police without the benefit of any follow-up x-rays or results of advanced blood and genetic testing.

97. As a result of the haphazard reports, findings and opinions made by Dr. Petska, Dr. Levas, Dr. Boyd and Lisko, Mr. Beine was arrested at the hospital and November 21, 2020.

98. Subsequent to his arrest, Mr. Beine was later charged with felony child abuse on December 15, 2020, in Milwaukee County Circuit Court Case Number 2020-CF-4472.

99. A second skeletal survey of P.B. was performed on December 14, 2020, by Dr. Plunk.

100. Dr. Plunk concluded:

1. Healing tibial fracture in similar alignment, described separately dictated radiograph.
2. Previously identified metaphyseal fracture of the right proximal tibia has decreased in conspicuity suggestive of further healing of a subacute injury.
3. Similar appearance of irregularity of the bilateral distal tibial metaphyses which remains concerning for previous metaphyseal fracture.
4. No new fracture appreciated.

101. Despite the similar appearance of the persistent irregularities of the bilateral distal tibial metaphyses when compared to the prior skeletal surveys, Dr. Plunk indicated that the images remained concerning for suspected child physical abuse at this subsequent encounter without further explanation.

102. On December 15, 2020, Lisko drafted a "Child Advocacy Follow-Up" report following her review of the second skeletal survey of P.B. performed by Dr. Plunk.

103. Despite the irregularities initially noted on P.B.'s bilateral tibial metaphyses remaining persistent, Lisko concluded that the conclusions of the two subsequent CHW radiologists performing the repeat skeletal surveys "[do] not impact the level of suspicion of abuse regarding the initial injury since [the repeat surveys are] performed to clarify initial injuries and detect new injuries," not with the purpose of confirming the initial diagnosis.

104. Lisko stood by her initial assessment of the case and again issued the legal conclusion that P.B. "has been physically abused."

105. Dr. Petska did not provide her own assessment of the case or findings but instead signed off on the narrative and conclusions of Lisko, without ever treating P.B., talking to the Beines or considering alternative hypotheses.

106. Lisko and Dr. Petska reported spending 20 minutes reviewing P.B.'s records and "discussing with providers" before generating this report.

107. The conclusions of the December 15, 2020, report are false.

108. Dr. Petska and Lisko intentionally refused to correct the initial incorrect findings of child abuse in their November 23, 2020 report despite contrary medical evidence suggesting an accidental injury caused by a medical condition.

109. At all relevant times, the Entity Defendants were responsible for ensuring there was a supervising physician for Lisko.

110. At all relevant times, the Entity and Individual Defendants had a legal obligation under state law to practice medicine within the bounds of established ethical standards of the profession.

111. The Entity Defendants, along with Dr. Levas and Dr. Petska, violated the applicable standards of care by failing to ensure that Lisko's erroneous and inappropriate examination and conclusions were supervised, reviewed, and corrected by a licensed physician.

112. None of the Defendants took any action to correct Lisko's numerous errors, to ensure that her medical care followed the required standard of care.

*Child Protective Services Investigates and Questions CHW's Conclusions*

113. While the Beines and P.B. were still at the hospital on November 21, 2020, CHW staff contacted Milwaukee Child Protective Services ("CPS") to begin their own investigation into alleged child abuse.

114. CPS received the report from the Entity Defendants staff at 3:35 p.m. on November 21, 2020.

115. CPS arrived to CHW on November 21, 2020.

116. CPS reported that P.B. "appeared clean and well nourished. [P.B.] didn't appear to be suffering from pain."

117. As a part of the CPS involvement, Ms. Beine was not allowed to see P.B. unsupervised, and Mr. Beine was prohibited from engaging in P.B.'s care in any capacity and was prohibited from having any physical contact with his son without CPS supervision.

118. As a result, the Beines were forced to move in with Ms. Beine's parents to help facilitate the mandatory supervision and care for P.B.

119. After several weeks of monitoring, CPS concluded that the allegations of physical abuse by Mr. Beine were unsubstantiated.

120. CPS concluded that "there were no safety concerns; No new present danger or impending danger threats were identified, so there was no reason to keep the case open, or refer the family for other services."

121. Specifically, CPS concluded that they were only "able to confirm Mr. Beine caused one break," and that even that injury to the long bone "was not caused intentionally or seemingly even recklessly."

122. CPS's conclusion was reached in January 2021, after monitoring the Beines and after its review of the follow-up testing by CHW, which indisputably could not confirm that the other observed abnormalities were in fact fractures or caused by any person, let alone Mr. Beine.

123. CPS's investigation revealed nothing to support a finding that the Beines were impatient, not aligned with the child, had any impulse control issues, or any ill intent toward P.B.

124. As a result, CPS closed its investigation, concluding that there was no support for the finding that Mr. Beine or anyone else had abused P.B. in any way.

*Follow-Up Testing Reveals Several Abnormalities & Other Experts Disagreement with CHW's Findings*

125. The results from P.B.'s blood tests that were taken in November at CHW revealed that P.B. had an elevated parathyroid hormone level (PTH) of 67.5, a level that is well above the normal range for infancy of 7.5-53.5 pg/mL.

126. Additionally, the testing revealed that P.B.'s blood had lower than normal levels of Factor IX, a protease that impacts the body's ability to clot blood.

127. Results also confirmed that P.B. had a vitamin D deficiency.

128. These testing results are relevant to the issue of bruising and the presence of metaphyseal abnormalities.

129. However, these results did not alter the findings of CHW staff, who continued to work with the Milwaukee County District Attorney's Office to pursue a criminal conviction against Mr. Beine.

130. On November 30, 2020, and December 14, 2020, P.B. was seen for follow-up appointments by radiology at CHW.

131. In both corresponding records, the reviewing radiologists are significantly less certain of the initial diagnosis of the three alleged corner metaphyseal lesions or fractures, noting:

a) Previously identified metaphyseal fracture of the right proximal tibia has decreased in conspicuity, suggestive of further healing of a subacute injury.

b) Similar appearance of irregularity of the bilateral distal tibial metaphysis which remains concerning for previous metaphyseal fracture.

132. The reviewing radiologist reported that the findings regarding the right proximal tibia can "suggest" healing of a subacute injury, undermining Dr. Boyd's conclusive determination that this abnormality was confirmed to be a fracture on November 21, 2020 – which led to Mr. Beine's arrest.

*A Visit to American Family Children's Hospital Nephrology Department and Second Opinions*

133. After Mr. Beine was charged, Mrs. Beine began doing research into how her own scoliosis diagnosis and an extensive family history of bone disorders and back issues may be linked to a genetic abnormality since Defendants refused to consider alternate hypotheses related to bone disease.

134. Mrs. Beine began looking into a second opinion and potential causes for the abnormalities noted on the x-rays performed by Defendants.

135. Mrs. Beine's research led her to the UW Health System ("UW Health") and the American Family Children's Hospital Nephrology Department.

136. Upon review of the CHW records, the physicians at UW Health noted that the x-ray report notes that there were "possible metaphyseal fractures bilaterally," but that this was "less clear" in their view.

137. The UW Health Physician stated to Mrs. Beine that he did not agree with the previous fractures.

138. The UW Health physicians also noted that the distal metaphysis in the lower extremities were of "unclear etiology and could be normal variants" based on their appearance on repeat scans from December 2020.

139. The visit notes also reflect that P.B. has slightly blue/grey sclera of the eyes which can be seen in cases of osteogenesis imperfecta, but that there were not the other traditional hallmarks of that condition.

140. The UW Health physician explained that there were two potential causes related to the injuries sustained by P.B., either: (1) there was more force used than what would typically be done in a diaper change, or (2) there was an underlying issue with P.B.'s bones.

141. Defendants failed to consider or investigate the second potential cause of an underling bone disease.

142. As a result of this hypothesis, a genetic blood test was ordered to test for skeletal dysplasia conditions. The genetic panel revealed an intronic FN1 variant of uncertain significance, a variant associated with bone weakness and unexplained fractures.

143. This conclusion by UW Health was reached after staff at CHW and MCW considered no alternative hypothesis to explain the abnormalities and ordered no additional testing.

144. Instead, CHW only used subjective, non-medical conclusions from a nurse practitioner that the injuries and abnormalities could only be explained by child abuse.

*The Opinion of Dr. Christopher Sullivan, Director of Pediatric Orthopedics and Scoliosis at Comer Children's Hospital, The University of Chicago Medicine*

145. Christopher Sullivan, M.D. ("Dr. Sullivan") is a board-certified orthopedic surgeon of the Pediatric Orthopedic Society of North America, practicing out of The University of Chicago Medicine Corner Children's Hospital.

146. Dr. Sullivan composed a report and an associated PowerPoint presentation on June 8, 2022, detailing how P.B.'s alleged corner metaphyseal lesions are not in fact representative of an injury or abuse of any kind because all "subsequent radiographs fail to show any fracture healing of the alleged injuries."

147. Dr. Sullivan's report opined that "there is no evidence of fracture healing at the proximal or distal ends of the tibia on either side. If these were fractures, there would be evidence of fracture healing on the repeat xrays. Therefore, the 'corner metaphyseal lesions' are not fractures at all".

148. Dr. Sullivan also noted in his report that the skeletal survey and xrays revealed other signs associated with metabolic bone disease in infancy and the weakening of bones.

149. Signs of "cupping of the anterior ribs" were seen in the xrays taken while P.B. was at CHW.

150. Cupping of the anterior ribs is indicative of rickets or other potential bone density issues.

151. Dr. Sullivan concluded his report with the following:

a) P.B. "has a single tibial shaft fracture which is non-displaced, which means it looks like a crack in a China plate. This fracture was produced by the minimal amount of force necessary and no more, or else the fracture would have been displaced, which means the two sides of the fracture would have been apart from each other. There were no other injuries.

b) Mr. Beine's explanation of hearing a pop when changing diapers is a very plausible explanation for this injury and is consistent with the fracture pattern.

c) So P.B had one injury, explained by observed activities without any other head, neurologic or abdominal injury or fractures. The reported other fractures made it seem suspicious, but there are no other additional fractures to explain. The workup that was triggered by the "overcall" on the additional fractures was all entirely negative, including demonstrating that no other fractures existed.

*The Opinion of Dr. Marvin Miller, Department of Medical Genetics & Birth Defects at Dayton Children's Hospital*

152. Marvin Miller, M.D. ("Dr. Miller") is a Yale-trained pediatric geneticist who is board-certified in the fields of pediatrics and medical genetics.

153. Dr. Miller conducts research on pediatrics, bone disorders, pediatric and maternal genetics and a variety of other topics.

154. Dr. Miller reviewed the medical records of both P.B and Ms. Beine.

155. Dr. Miller took note of the previous records of P.B.'s pediatrician, noting that there were no bruises or signs of child abuse reported on any previous well checks.

156. Dr. Miller also made note that the subsequent testing conducted by U.W. Health determined that P.B. was identified to have a genetic bone abnormality on the Invite 150 Gene Panel.

157. Based on his observations, Dr. Miller opined that there were several identifying characteristics of metabolic bone disease found in P.B, including:

a) "Bone in bone" of the vertebrae
b) Cupped ribs
c) Sclerosis of proximal femurs
d) Healing of a CML with no callus formation

158. Dr. Miller pointed out that Lisko flatly ignored diagnostically relevant information in making her report when she wrote "CML fractures associated with birth injury are generally only seen in traumatic deliveries of large for gestational [age] infants."

159. P.B. was large for gestational age and weighed nearly 10 pounds at birth.

160. Dr. Miller took issue with Lisko's legal conclusion that P.B. "has been physically abused," pointing out that Lisko's "diagnosis" appeared to be solely based on the conclusion that there were three alleged CMLs, when peer reviewed publications

have demonstrated that these abnormalities are not specific for trauma or child abuse and can in fact be signs of metabolic bone disease in infancy.

161. Dr. Miller did not diagnose P.B. with a specific bone disease.

162. However, Lisko, Dr. Petska, Dr. Boyd, Dr. Levas, Dr. Plunk, Bretl or any of the Entity Defendants ever considered a metabolic bone disease.

*The Opinion of Dr. Susan Gootnick, Board Certified Radiologist Since 1977*

163. Susan Gootnick, M.D. ("Dr. Gootnick") is a board-certified radiologist with more than 48 years of diagnostic and teaching experience.

164. Dr. Gootnick reviewed the reports from CHW, as well as P.B. and Ms. Beine's medical history in preparation of forming her opinion.

165. Dr. Gootnick detailed in her report on April 18, 2022, that P.B. was born at nearly ten pounds to a mother with notably low vitamin D levels.

166. Dr. Gootnick concluded that the skeletal survey demonstrated evidence consistent with metabolic bone disease in infancy.

167. Dr. Gootnick opined that the CMLs identified previously as "fractures" were not fractures but instead evidence of metabolic bone disease or healing from a rickets diagnosis.

168. Dr. Gootnick concluded that "there is no evidence of child abuse but there is extensive radiographic evidence of metabolic bone disease most commonly rickets in the neonatal period."

169. However, none of the Individual Defendants or the Entity Defendants considered a metabolic bone disease or rickets.

*The Opinion of Dr. Susanna Sorrentino*

170. Susanna Sorrentino, M.D. ("Dr. Sorrentino"), a physician at Medical Genetics of Nevada, reviewed P.B.'s medical history, Ms. Beine's medical history, the medical reports from CHW, as well as other health and physical attributes of P.B.

171. Dr. Sorrentino discovered that P.B. suffers from a genetic abnormality to the FN1 gene – specifically intronic, heterozygous variant.

172. Dr. Sorrentino issued a report detailing her findings and P.B.'s ultimate diagnosis of Spondylometaphyseal Dysplasia, Corner Type, a disease that results in bone weakening, unexplained "corner fracture like lesions," and a variety of other symptoms that often resolve in childhood.

173. P.B. was first diagnosed with Spondylometaphyseal Dysplasia, Corner Type in this report on December 6, 2022.

174. On December 6, 2022, Plaintiffs learned that P.B.'s injuries were caused by his bone disorder.

175. All of the above symptoms observed by Dr. Sorrentino and others were present in November 2020 when Philip was seen at CHW.

176. Expressions of this type of mutation were observed by Dr. Sorrentino throughout P.B.'s maternal familial side, including his mother sharing the same genetic mutation of the FN1 gene.

177. Based on all of the information reviewed, Dr. Sorrentino concluded that it is more likely than not that the injury to P.B.'s tibia and the identified irregularities were symptoms of that disorder, and not the result of abuse.

178. However, the Defendants failed to consider or investigate a Spondylometaphyseal Dysplasia, Corner Type diagnosis and continued to claim that Mr. Beine abused P.B., without a factual basis to do so.

*CHW Staff Continued to Assist with Mr. Beine's Prosecution Despite Conflicting Expert Opinions*

179. During and following the medical evaluation of P.B., Defendants acted in coordination and conspiracy with one another in opposition to Plaintiffs interests.

180. At some point after Lisko, Dr. Boyd, Dr. Petska and Dr. Levas's inappropriate and incomplete examination of P.B., Defendants came to realize that the premature and illegitimate conclusion that P.B. had been subjected to abuse was wrong, and was the result of their violations of the applicable standards of care, their violations of applicable policies and procedures, and their inappropriate and unjustifiable conduct during the course of their investigation into P.B.'s injuries.

181. Rather than admit the truth and concede that the abuse allegations were premature and inaccurate, and in order to cover up and obscure the evidence of their wrongdoing and of these violations, Defendants conspired with one another to generate false substantiation for the allegations of abuse, and to support their decision to report and continue assisting prosecutors in a felony child abuse charge.

182. Despite being hampered by Defendants' misconduct, throughout the process, Plaintiffs engaged in advocacy protected by the First Amendment to rebut the premature and false allegations of abuse, in order to keep P.B. as a member of their family and fight Mr. Beine's child abuse charge.

183. In violation of the applicable standard of care and applicable hospital policies and procedures, Defendants intentionally ignored abnormal blood results, did not seek a full family medical history for P.B., and failed to consider alternate hypotheses related to bone disease.

184. The reports from four individual physicians were shared with the Entity Defendants, Individual Defendants and prosecution.

185. Despite the opinions of several experts and P.B.'s diagnosis of a genetic condition related to the observed abnormalities, both Dr. Petska and Dr. Boyd continued to assist the prosecution with the pursuit of a conviction against Mr. Beine.

186. On May 4, 2022, the charging prosecutor, Attorney Katherine Seelow, wrote in an electronic communication that she had spoken with Dr. Petska and Dr. Boyd about their findings related to child abuse.

187. During this communication, Dr. Petska and Dr. Boyd provided opinions about the injuries to P.B. and conclusions that Mr. Beine must have abused his son rather than that the abnormalities could be related to a genetic condition or metabolic bone disorder.

188. Dr. Petska and Dr. Boyd collaborated with Attorney Seelow to prepare demonstrative exhibits at the State's request for prosecution.

189. Dr. Petska and Dr. Boyd refused to acknowledge the new evidence and medical records not previously considered by Individual Defendants and Entity Defendants.

190. Instead, Dr. Petska and Dr. Boyd attempted only to protect their and other Defendants initial incorrect and uninformed conclusions.

191. Dr. Petska and Dr. Boyd reviewed the expert findings for the prosecution, preparing rebuttals to the other physicians, while failing to consider the entirety of the records from the November and December 2020 treatment provided by CHW, as well as P.B.'s past medical records and treatment for low Vitamin D and genetic abnormalities.

192. Further, it was discovered later in the defense investigation that Dr. Petska and Dr. Boyd continued their assistance with the prosecution without reviewing all relevant evidence necessary for providing an appropriate and accurate diagnosis in child abuse matters as set forth in the treatise guiding investigations, *Diagnostic Imaging of Child Abuse*, Third Edition, Edited by Dr. Paul K. Kleinman.

193. During the investigation into the criminal case, the defense conducted telephonic interviews with Dr. Boyd and Dr. Plunk, on September 28, 2022.

194. During this telephone call, Dr. Boyd revealed that despite his assistance to the prosecution to "debunk" the conclusions of the several consulting experts, he had never personally reviewed the follow up radiology testing CHW performed in December 2020 to determine if there was evidence of healing injuries.

195. Dr. Boyd agreed that it was possible that a genetic abnormality could be related to the appearance of bone fractures, but that this was generally outside of his expertise.

196. Dr. Boyd confirmed that he had not been aware of the findings from the repeat scans while he continued to draw his own conclusions and support Mr. Beine's prosecution.

197. Instead, Dr. Boyd stood by his initial belief that the injury must have been caused by intentional infliction of child abuse, despite the fact that the repeat scans performed at CHW showed that abnormalities did not exhibit signs of healing associated with fractures. Rather, the abnormalities persisted with little change, confirming that they were not fractures.

198. Dr. Boyd, Dr. Petska and the Entity Defendants continued recklessly representing to law enforcement and the prosecution team that P.B. undoubtedly had bone fractures.

199. The ongoing participation and unwavering assistance to the prosecution by CHW and MCW staff constitutes medical malpractice, libel, and slander of Mr. Beine and his character.

*The Polices, Procedures and Practices of Entity Defendants*

200. The premature and incorrect abuse allegations, along with the misconduct that took place during the course of P.B.'s care were caused by a number of flawed policies by Entity Defendants and their Child Advocacy Program and/or Child Advocacy Center.

201. The Child Advocacy Program and/or Child Advocacy Center maintained by the Entity Defendants was a system designed only to confirm abuse allegations, rather than to fairly and accurately evaluate what happened when there is a possibility of abuse.

202. This improper, biased and prejudicial approach to medical care permeated every aspect of the Child Advocacy Program and/or Child Advocacy Center maintained by the Entity Defendants.

203. For example, the Child Advocacy Team, including Bretl, Lisko and Dr. Petska were not required to physically examine P.B. or talk with the Beines before concluding that P.B. had been abused.

204. The Child Advocacy Team was not required to obtain a full family medical history of P.B. before concluding that P.B. had been abused.

205. The Child Advocacy Team and Individual Defendants were not required to disprove or even consider alternate hypotheses related to bone diseases before concluding that P.B. had been abused.

206. The Entity Defendants maintained a flawed and biased system with the primary purpose of confirming abuse rather than investigating the truth. All of the flaws in the medical evaluation and lack of medical oversight were embedded within this broken system, including:

a) Failing to gather an appropriate medical and family history from the Beines.
b) Reaching a premature and unjustified determination of child abuse.
c) Reaching a premature and unjustified determination that P.B.'s bruise was "unexplainable".
d) Failing to investigate abnormal blood and bone lab results.

e) Failing to consider the evaluation of specialist providers outside of the Child Advocacy Program.

207. The policy of the Entity Defendants is only to look for reasons to explain their abuse allegations rather than find out the true cause of the child's injuries.

**PLAINTIFFS' DAMAGES**

208. As a result of Defendants' misconduct, the Beines suffered a series of catastrophic harms, including some of the most severe harms imaginable – the unraveling of a family, the devastation of the Beine's reputation, and the heartbreaking loss of precious moments with their newborn child.

209. The impact of the misdiagnosis and rush to judgement by CHW and MCW staff will have a lasting effect on the Beines and tarnish their reputation in the community forever.

210. Within hours of seeking treatment for their young son, Mr. Beine was in custody facing felony charges and Child Protective Services was involved.

211. In the initial aftermath of the visit, Mr. Beine was not allowed to touch, hold, or provide care for P.B.

212. This caused the Beines to uproot from their home and move in with family in order to adhere to the new restrictions.

213. The Beine family, having had to move in with family members to comply with CPS restrictions resulting from the early misdiagnosis, began paying rent to family on top of their mortgage, requiring that they rent out their own home to make ends meet.

214. Faced with frequent medical appointments and the need to obtain treatment for P.B., who continued to struggle with a serious condition that went undiagnosed for far too long due to the lack of proper care by CHW and MCW, Ms. Beine struggled upon her return to work after maternity leave.

215. The Defendants' conduct significantly impacted Mrs. Beine's immediate earning potential and ultimately led to her termination from her position when the time and attention away to support P.B. and the pending legal case became too much.

216. Expenses and costs continued to be incurred for the Beines, as they were forced to retain private counsel to handle the criminal case before its ultimate dismissal and had to hire several expert doctors to review the findings of CHW and MCW.

217. The misdiagnosis and lack of proper care for P.B. has likewise impacted Mr. Beine's career, as he is employed as a safety engineer which requires him to have specific security clearances for certain job sites.

218. As a result of the felony charge against Mr. Beine, he could not obtain the security clearances needed for several job sites, which limits his ability to exercise his full employment duties.

219. This caused Mr. Beine to lose out on job opportunities and to reveal the child abuse investigation to his employer, further damaging his reputation in the community and inhibiting his career ambitions.

220. Despite the dismissal of criminal charges, the charges remain a matter of public record and on any criminal background check, forever impugning Mr. Beine's once stellar reputation in the community.

221. Family, friends, employers, and associates all became aware of the legal proceedings pending against Mr. Beine, as well as the allegations that he had traumatically and violently abused his son.

222. These allegations and the rushed conclusions of CHW and MCW staff were repeatedly discussed in the public forum of the circuit court, causing substantial damage to Mr. Beine and his reputation in the community.

**COUNT I**
**42 U.S.C. § 1983 – Due Process – All Defendants**

223. Plaintiffs incorporate each and every paragraph of this Complaint as if fully restated herein.

224. The Beines have a liberty interest in their existing and future familial relationship with P.B.

225. In the manner described more fully above in this Complaint, the Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, acted to deprive the Beines of their liberty interest in their familial relationship with P.B., without due process of law and in violation of their rights secured by the U.S. Constitution.

226. The Defendants' misconduct described in this Count was undertaken pursuant to the policies and practices of one or more of the Entity Defendants.

227. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiffs' constitutional rights.

228. As a result of the Defendants' misconduct described in this Count, Plaintiffs were deprived of their familial relationship with P.B. and suffered great mental and emotional anguish and other grievous and continuing injuries and damages as set forth above.

**COUNT II**
**42 U.S.C. § 1983 – Equal Protection ("Class of One") – All Defendants**

229. Plaintiffs incorporate each and every paragraph of this Complaint as if fully restated herein.

230. In the manner described more fully above in this Complaint, the Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, treated Plaintiffs less favorably and afforded them fewer rights, privileges, and procedural protections than similarly situated individuals were treated.

231. In doing so, the Defendants acted with illegitimate animus towards the Beines.

232. There was no rational basis for the manner in which the Defendants treated the Beines less favorably than other parents who bring their children into Entity Defendants' Hospitals when their children are injured.

233. The Defendants' misconduct described in this Count was undertaken pursuant to the policies and practices of one or more of the Entity Defendants.

234. The misconduct described in this Count was undertaken pursuant to the policies and practices of one or more of the Entity Defendants.

235. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to the Beine's constitutional rights.

236. As a result of Defendants' misconduct described in this Count, the Beines were deprived of their familial relationship with P.B. and suffered great mental and emotional anguish and other grievous and continuing injuries and damages as set forth above.

## <u>COUNT III</u>
## 42 U.S.C. § 1983 – Failure to Intervene – All Defendants

237. Plaintiffs incorporate each and every paragraph of this Complaint as if fully restated herein.

238. In the manner described more fully above, during the Constitutional violations described above, all of the Individual and Entity Defendants stood by without intervening to prevent the misconduct.

239. The Defendants' misconduct described in this Count was undertaken pursuant to the policies and practices of one or more of the Entity Defendants.

240. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to the Beines' constitutional rights.

241. As a direct and proximate result of the Individual Defendants' failure to intervene to prevent the violation of the Beines' constitutional rights, Plaintiffs were deprived of their familial relationship with P.B. and suffered great mental and emotional anguish and other grievous and continuing injuries and damages as set forth above.

**<u>COUNT IV</u>**
**42 U.S.C. § 1983 – Supervisory Liability – Dr. Petska and Dr. Levas**

242. Plaintiffs incorporate each and every paragraph of this Complaint as if fully restated herein.

243. The constitutional injuries complained of herein were proximately caused by a pattern and practice of misconduct, which occurred with the knowledge and consent of those of the Individual Defendants who acted in a supervisory capacity, such that these Defendants personally knew about, facilitated, approved, and condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation by their actions or by their deliberately indifferent failure to act.

244. As a direct and proximate result of the misconduct referenced above, the Beines were deprived of their familial relationship with P.B. and suffered great mental and emotional anguish and other grievous and continuing injuries and damages as set forth above.

**<u>COUNT V</u>**
**Negligence – All Defendants**

245. Plaintiffs incorporate each and every paragraph of this Complaint as if fully restated herein.

246. At all times relevant to the events described above, the physicians, advance practice nurse practitioners, physician assistants, registered nurses, administrators, employees, agent, and apparent agents of Entity Defendants had a duty to exercise ordinary care to refrain from any act which will cause foreseeable harm to the Beines, and to refrain from any act which creates an unreasonable risk to the Beines.

247. At all times relevant to the events described above, each Individual Defendant had a duty to exercise ordinary care to refrain from any act which will cause foreseeable harm to the Beines, and to refrain from any act which creates an unreasonable risk to the Beines.

248. The Defendants breached their duty of ordinary care in one or more of the following ways:

a. Negligently conducted a child welfare exam in violation of policies and procedures;

b. Negligently transferred the care of P.B. to a nurse practitioner rather than to a board-certified child abuse physician;

c. Improperly "identified" fractures found in P.B's skeletal scans;

d. Misinterpreted abnormal radiology scans;

e. Misinterpreted abnormal bloodwork as normal;

f. Failed to get the appropriate specialties or consultations prior to concluding that child abuse had occurred.

g. Failed to consider Mrs. Beine's family medical history;

h. Failed to obtain Ms. Beine's medical history;

i. Made allegations of abuse on the basis of medical findings tainted by one or more of the above failures;

j. Removed P.B. from Mr. Beine's care on the basis of medical findings tainted by one or more of the above failures; and

k. Temporarily terminated the Beines' normal familial relationship with P.B. on the basis of medical findings tainted by one or more of the above failures.

249. As a result of the Defendants' misconduct described in this Count, The Beines were deprived of their familial relationship with P.B. and suffered great mental

and emotional anguish and other grievous and continuing injuries and damages as set forth above.

**COUNT VI**
**Negligent Infliction of Emotional Distress – All Defendants**

250. Plaintiffs incorporate each and every paragraph of this Complaint as if fully restated herein.

251. At all times relevant to the events described above, the physicians, nurse practitioners, physician assistants, registered nurses, administrators, employees, agents, and apparent agents of the Entity Defendants acted without ordinary care or as a person in their conduct described herein.

252. At all times relevant to the events described above, each of the Individual Defendants acted without ordinary care or as a reasonable person in their conduct described herein.

253. All of the conduct described herein by Defendants, a reasonable person would recognize as creating an unreasonable risk of injury to the Beines.

254. As a proximate result of Defendants' negligent conduct, the Beines suffered severe emotional distress and mental anguish as described more fully above.

**COUNT VII**
**Intentional Infliction of Emotional Distress – All Defendants**

255. Plaintiffs incorporate each and every paragraph of this Complaint as if fully restated herein.

256. At all times relevant to the events described above, the physicians, nurse practitioners, physician assistants, registered nurses, administrators, employees, agents,

and apparent agents of the Entity Defendants intentionally and/or recklessly in their conduct described herein.

257. At all times relevant to the events described above, each of the Individual Defendants acted intentionally and/or recklessly in their conduct described herein.

258. All of the conduct described herein by Defendants was extreme and outrageous.

259. As a proximate result of Defendants' intentional and/or reckless extreme and outrageous conduct, the Beines suffered severe emotional distress as more fully described above in this Complaint.

**COUNT VIII**
**Tortious Interference – All Defendants**

260. Plaintiffs incorporate each and every paragraph of this Complaint as if fully restated herein.

261. At all relevant times, prior to November 2020, Mr. Beine had a reasonable expectation to be able to go to work at all job sites without the fear of being denied because of a felony child abuse charge.

262. At all times relevant to the events described above, Defendants knew that a felony charge of child abuse would limit Mr. Beine's career opportunities.

263. Defendants' negligent, willful, wanton, reckless, and false representations related to Mr. Beine resulted in Mr. Beine's denial from several job sites and hindered his professional growth.

264. Mr. Beine suffered personal and pecuniary damages, and harm to his reputation as a result of the Defendants' tortious interference as more fully described above.

**<u>COUNT IX</u>**
**Defamation – All Defendants**

265. Plaintiffs incorporate each and every paragraph of this Complaint as if fully restated herein.

266. At all relevant times to the events described above, a physician, nurse practitioner, physician assistant, registered nurse, administrator, employee, agent, and/or apparent agent of the Entity Defendants stated that Mr. Beine had abused his child.

267. At all relevant times to the events described above, a physician, nurse practitioner, physician assistant, registered nurse, administrator, employee, agent, and/or apparent agent of the Entity Defendants published the statement that Mr. Beine had abused his child.

268. At all times relevant to the events described above, each of the Individual Defendants stated and/or adopted the statement that Mr. Beine had abused his child.

269. At all times relevant to the events described above, each of the Individual Defendants published the statement that Mr. Beine had abused his child.

270. The statement that Mr. Beine abused his child is false.

271. No recognized privilege exists for any defendant stating that Mr. Beine had abused his child.

272. As a direct and proximate result of the Defendants' actions, Mr. Beine suffered injury of a personal and pecuniary nature including his forever tarnished reputation in the community as more fully described above.

## JURY DEMAND

The Beines hereby demand a trial by jury of all issues triable of right to a jury.

WHEREFORE, Plaintiffs, the Beines, seek the following relief:

A. Compensatory and punitive damages as are available under 42 U.S.C. section 1983 for violation of their constitutional rights.

B. Plaintiffs' costs, including reasonable attorney fees, as provided by 42 U.S.C. section 1988(b), for violation of their constitutional rights.

C. Compensatory and Punitive damages in an amount to be determined at trial that will fairly compensate Plaintiffs for their injuries, with respect to all claims.

D. Costs, disbursements, and reasonable attorney fees incurred in their action.

E. Any further relief the Court deems just and equitable.

Dated this 8th day of August, 2025.

Respectfully submitted,

GIMBEL, REILLY, GUERIN & BROWN LLP

By:
*Electronically signed by Nicole M. Masnica*
Nicole M. Masnica
State Bar No. 1079819
nmasnica@grgblaw.com
Zachary T. Wroblewski
State Bar No. 1119194
zwroblewski@grgblaw.com
Attorneys for Plaintiffs Evan and Michelle Beine

POST OFFICE ADDRESS:

330 East Kilbourn Avenue, Suite 1170
Milwaukee, Wisconsin 53202
Telephone:  414/271-1440