UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**EVAN BEINE** and
**MICHELLE BEINE,**

    Plaintiffs,

v.                                                                                              Case No. 25-CV-432-SCD

**CHILDREN'S HOSPITAL AND HEALTH SYSTEM, INC.,**
**CHILDREN'S HOSPITAL OF WISCONSIN, INC.,**
**THE MEDICAL COLLEGE OF WISCONSIN, INC.,**
**HILLARY W. PETSKA,**
**MICHAEL N. LEVAS,**
**KEVIN P. BOYD,**
**MATTHEW R. PLUNK,**
**HEATHER L. LISKO,** and
**DEBORAH A. BRETL,**

    Defendants.

---

### DECISION AND ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS AMENDED COMPLAINT

---

    In this lawsuit, Evan and Michelle Beine generally assert that various medical professionals rushed to judgment when they accused Evan of physically abusing P.B., the couple's five-week-old baby. The incident began on November 21, 2020, when Mr. Beine heard a "popping sound" while changing P.B.'s diaper. Later that morning, the Beines brought P.B. to the emergency room at Children's Wisconsin, where x-rays revealed a recent fracture to P.B.'s left leg and apparent evidence of healing fractures in both legs.

    Believing that the fractures had been caused by more force than what would typically be used during a diaper change, hospital staff referred the matter to its child advocacy team as an incident of potential child abuse. The child advocacy team determined, based solely on

its review of the imaging results, that P.B.'s injuries were consistent with physical abuse. A member of the team contacted police, who responded to the hospital and, after talking to hospital staff, arrested Mr. Beine. A few weeks later, on December 15, 2020, Mr. Beine was charged in state court with felony child abuse.

Hospital staff also referred the matter to child protective services. While the CPS investigation was ongoing, the Beines were prohibited from having certain contact with their infant son. CPS closed its investigation in January 2021, finding the allegations of physical abuse unsubstantiated. Around that same time, the Beines began seeking second opinions about the causes of P.B.'s injuries. Although several medical professionals posited throughout 2022 that P.B.'s injuries could have been caused by an underlying bone disease, it wasn't until December 2022 that the Beines received an official diagnosis confirming a genetic bone disorder. Despite this new evidence, the criminal prosecution continued, allegedly with the help of several members of the hospital's child advocacy team. The charge was eventually dismissed after Mr. Beine completed a deferred prosecution agreement.

In March 2025, the Beines sued the medical professionals involved in the child abuse allegations, as well as their employers and the hospital itself, asserting various claims under both federal and state law. The Beines later filed an amended complaint that asserts nine counts against nine defendants. The defendants have moved to dismiss the amended complaint, arguing that all nine counts are time-barred under the applicable statute of limitations. The defendants further contend that the amended complaint fails to state plausible claims for relief under either federal or state law.

Because the allegations in the amended complaint clearly establish that the Beines' claims are untimely, I will grant the defendants' motions to dismiss.

2

BACKGROUND

At around 11:30 a.m. on November 21, 2020, Evan and Michelle Beine brought their five-week-old baby, P.B., to the emergency room at the Milwaukee campus of Children's Wisconsin after Mr. Beine heard a "popping sound" while changing P.B.'s diaper at home. Am. Compl. ¶¶ 36–42, ECF No. 39. Michael Levas, a pediatric emergency medicine physician assigned to P.B.'s care, ordered and administered x-rays and took blood work. *Id.* ¶¶ 12, 44–45. Kevin Boyd (a radiologist) reviewed the x-rays and noted the following findings: acute, oblique minimally displaced fracture of the mid left tibial diaphysis; subacute appearing, healing metaphyseal corner fracture of the proximal right tibial metaphysis; and additional metaphyseal fractures suggested of the medial distal right and left tibial metaphysis. *Id.* ¶¶ 13, 54–55.

The child advocacy team at the hospital immediately investigated the matter as a potential incident of child abuse. *See* Am. Compl. ¶¶ 8–10, 45, 60. The team was led by Heather Lisko and Deborah Bretl, nurse practitioners who specialize in child advocacy, protection services, and child physical abuse. *Id.* ¶¶ 15–16, 46, 62. "Under Dr. Levas's supervision, Dr. Kenzie contacted Bretl and the Child Advocacy Center at or around 1:23 p.m. to report concerns of potential child abuse." *Id.* ¶ 46. The child advocacy team did not examine P.B. or obtain a complete or accurate medical history. *Id.* ¶¶ 61, 65. Instead, based solely on her review of the available medical records, Lisko concluded that P.B.'s injuries were "highly concerning for child physical abuse." *See id.* ¶¶ 60–76. According to Lisko, "unexplained" bruising on P.B.'s left leg also supported her conclusion that P.B. had been physically abused. *See id.* ¶¶ 77–82. However, providers at P.B.'s recent wellness visits—including one the day prior—did not note any bruising. *See id.* ¶ 83. Lisko's supervising

3

physician, Hillary Petska, signed off on her report without examining P.B. or meeting with the Beines. *Id.* ¶¶ 11, 18–19, 62, 93–95.

Later that afternoon, hospital staff contacted the police. *See* Am. Compl. ¶¶ 47–49. By that time, Dr. Levas (who is not a radiologist) had reviewed Dr. Boyd's findings and interpretation. *See id.* ¶¶ 53–54. Dr. Levas told the police that P.B. had a long bone "spiral" fracture in his left leg and three other fractures in his legs that had healed. *Id.* ¶¶ 50–52. Dr. Levas also told the police that P.B.'s injuries were not consistent with Mr. Beine's story and that a large amount of force was necessary to create the four fractures allegedly observed on the x-rays. Based on Dr. Levas's statements, Mr. Beine was arrested and taken into police custody. *Id.* ¶¶ 56, 97. On December 15, 2020, Mr. Beine was charged in Milwaukee County Circuit Court with felony child abuse. *Id.* ¶ 98.

Hospital staff also contacted child protective services, which opened its own investigation. *See* Am. Compl. ¶¶ 20–23, 113. CPS staff examined P.B. late in the afternoon on November 21, 2020, and noted that he appeared clean, well-nourished, and not in any pain. *Id.* ¶¶ 114–16. While the CPS investigation was ongoing, Ms. Beine was not allowed to see P.B. unsupervised, and Mr. Beine was prohibited from having unsupervised physical contact with P.B or engaging in P.B.'s care in any capacity. *Id.* ¶¶ 117, 211. To accommodate those restrictions, the family moved in with Ms. Beine's parents and had to pay rent on top of their mortgage. *Id.* ¶¶ 118, 212–13. After several weeks of monitoring—and considering follow-up testing (discussed below)—CPS closed its investigation in January 2021, finding that no physical abuse had occurred. *See id.* ¶¶ 119–24.

Meanwhile, the blood work results came in. *See* Am. Compl. ¶ 125. Testing revealed an elevated parathyroid hormone level and lower than normal levels of Factor IX, a protease

4

that impacts the body's ability to clot blood. *Id.* ¶¶ 125–26. Testing also revealed that P.B. had a vitamin D deficiency. *Id.* ¶ 127.

P.B. had two follow-up appointments at Children's, on November 30, 2020, and December 14, 2020, respectively. *See* Am. Compl. ¶ 130. X-rays from those appointments revealed further healing of the right leg fracture, which was suggestive of a subacute injury. *Id.* ¶¶ 131–32. However, the reviewing radiologists were less certain about whether the other metaphyseal fractures had been caused by a subacute injury. Matthew Plunk, the doctor who performed the skeletal survey at the December 14 appointment, nevertheless concluded that the images remained concerning for suspected child physical abuse. *Id.* ¶¶ 14, 99–101. The next day, APNP Lisko drafted a child advocacy follow-up report based on her review of Dr. Plunk's skeletal survey. *Id.* ¶¶ 102–04. Lisko concluded that the follow-up diagnostics did not impact the level of suspicion of abuse, and she stood by her initial assessment that P.B. had been physically abused. Dr. Petska again signed off on Lisko's report without treating P.B., talking to the Beines, or considering alternative hypotheses. *Id.* ¶ 105.

Thereafter, the Beines sought second opinions about P.B.'s injuries from UW Health System. *See* Am. Compl. ¶¶ 133–35. Based on their review of P.B.'s medical records, UW Health physicians noted "possible metaphyseal fractures bilaterally," but, in their view, that finding was "less clear." *Id.* ¶¶ 136–37. The physicians further noted that the distal metaphysis in P.B.'s legs was of "unclear etiology and could be normal variants." *Id.* ¶¶ 138–39. One UW Health physician explained that there were two possible causes of P.B.'s injuries: (1) more force used than what would typically be done in a diaper change, or (2) an underlying bone issue. *Id.* ¶ 140. Genetic testing subsequently revealed a variant associated with bone weakness and unexplained fractures. *Id.* ¶ 142.

5

The Beines continued to seek additional opinions throughout 2022. In April, Susan Gootnick (a radiologist) concluded that P.B.'s injuries were evidence of metabolic bone disease or rickets, not child abuse. *See* Am. Compl. ¶¶ 163–68. Similarly, in June, Chrisopher Sullivan (a pediatric orthopedic surgeon) reported that the metaphyseal lesions seen on previous x-rays were not fractures at all, but rather were signs of metabolic bone disease and weakening bones. *See id.* ¶¶ 145–51. Thus, according to Dr. Sullivan, P.B. had sustained only one injury—a left leg fracture that was produced by a minimal amount of force and, therefore, consistent with Mr. Beine's diaper-change story. Marvin Miller (a pediatric geneticist) also noted characteristics of metabolic bone disease. *See id.* ¶¶ 152–61. Ultimately, on December 6, Susanna Sorrentino (a medical geneticist) diagnosed spondylometaphyseal dysplasia, corner type—a disorder that results in bone weakening, unexplained corner fracture like lesions, and a variety of other symptoms that often resolve in childhood. *See id.* ¶¶ 170–77. Based on the information she reviewed, Dr. Sorrentino concluded that it was more likely than not that P.B.'s injuries were symptoms of that disorder and not the result of abuse.

The Beines shared these findings with prosecutors and members of the hospital's child advocacy team, but they refused to move off their positions, and Dr. Petska and Dr. Boyd continued to assist the prosecution. *See* Am. Compl. ¶¶ 184–99. Specifically, Dr. Petska and Dr. Boyd met with the charging prosecutor, reiterated their child abuse findings, helped prepare demonstrative exhibits for use at trial, reviewed some expert findings, and prepared rebuttals to other physicians. Dr. Boyd later admitted, however, that he never personally reviewed the follow-up radiology testing performed in December 2020. In July 2023, Mr. Beine pleaded no contest to felony child neglect and entered into a deferred prosecution

agreement. *See State v. Beine*, Milwaukee County Case Number 2020CF4472, *available at* https://wcca.wicourts.gov/case.html (last accessed Dec. 15, 2025).[1]

In March 2025, the Beines filed suit in federal court, asserting various federal and state-law claims against nine defendants. *See* Compl., ECF No. 1. The matter was randomly assigned to me, and all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 3, 14 & 16. After the defendants moved to dismiss the original complaint, *see* ECF Nos. 27 & 33, the Beines filed an amended complaint in August 2025 that contains additional factual allegations, *see* ECF No. 39. On September 12, 2025, the defendants moved to dismiss the amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* MCW Defs.' Mot. Dismiss, ECF No. 43; Children's Defs.' Mot. Dismiss, ECF No. 45.

## MOTION TO DISMISS STANDARD

A motion to dismiss under Rule 12(b)(6) "challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "To survive a motion to dismiss for failure to state a claim, the . . . complaint must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Milchtein v. Milwaukee County*, 42 F.4th 814, 821 (7th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678

---

[1] A court may take judicial notice of public records available on government websites. *See* Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *see also Bova v. U.S. Bank, N.A.*, 446 F. Supp. 2d 926, 930 n.2 (S.D. Ill. 2006) (collecting cases where courts took judicial notice of public records and government documents).

(2009)). In reviewing a Rule 12(b)(6) motion, courts must "accept the well-pleaded facts in the complaint as true and draw reasonable inferences in the plaintiff's favor." *Bronson v. Ann & Robert H. Lurie Child.'s Hosp. of Chi.*, 69 F.4th 437, 448 (7th Cir. 2023) (citing *KAP Holdings, LLC v. Mar-Cone Appliance Parts Co.*, 55 F.4th 517, 523 (7th Cir. 2022)). "[B]ut legal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth." *Id.* (quoting *KAP Holdings*, 55 F.4th at 523).

## DISCUSSION

The amended complaint asserts nine counts against nine defendants. *See* Am. Compl. ¶¶ 223–72. Four of the nine counts arise under federal law, specifically 42 U.S.C. § 1983: (I) violation of due process; (II) violation of equal protection; (III) failure to intervene; and (IV) supervisory liability. The other five counts arise under state law: (V) negligence; (VI) negligent infliction of emotional distress; (VII) intentional infliction of emotional distress; (VIII) tortious interference; and (IX) defamation. The Beines bring these counts against three entities and six individuals, which can be grouped into two categories: those affiliated with The Medical College of Wisconsin, Inc. (Dr. Petska, Dr. Levas, Dr. Boyd, and Dr. Plunk), and those affiliated with Children's Hospital and Health System, Inc., and Children's Hospital of Wisconsin, Inc. (APNP Lisko and APNP Bretl). The Beines assert each count against all nine defendants except for Count IV, which they assert against only Dr. Petska and Dr. Levas.

The defendants have moved to dismiss all nine counts asserted in the amended complaint. They first argue that the Beines' claims are barred by the statute of limitations. "A limitations defense is not often resolved on a Rule 12(b)(6) motion because 'a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations.'" *Amin*

8

*Ijbara Equity Corp. v. Vill. of Oak Lawn*, 860 F.3d 489, 492 (7th Cir. 2017) (quoting *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009)). However, dismissal at this early stage is appropriate "when a plaintiff's allegations clearly establish that the claims are untimely." *Cielak v. Nicolet Union High Sch. Dist.*, 112 F.4th 472, 477 (7th Cir. 2024) (citing *Milchtein*, 42 F.4th at 822). According to the defendants, that is the case here.

The parties agree that a three-year statute of limitations applies to each claim asserted in the amended complaint. *See* MCW Defs.' Br. 7–8, ECF No. 44; Children's Defs.' Br. 5–6, ECF No. 47; and Pls.' Resp. 11, ECF No. 53. The Beines filed this action on March 20, 2025. Thus, to be timely, their claims had to accrue on or after March 20, 2022.

"A claim ordinarily accrues 'when [a] plaintiff has a complete and present cause of action.'" *Petrella v. MGM, Inc.*, 572 U.S. 663, 670 (2014) (quoting *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997)). Therefore, claims under § 1983 generally accrue "'when a plaintiff knows the fact and the cause of an injury'"— in other words, when "the plaintiff knows or should know that his constitutional rights were violated." *Cielak*, 112 F.4th at 477 (first quoting *Amin Ijbara Equity Corp.*, 860 F.3d at 493; then citing *Towne v. Donnelly*, 44 F.4th 666, 670–71 (7th Cir. 2022)). In Wisconsin, tort claims accrue "on the date the injury is discovered or with reasonable diligence should [have been] discovered, whichever occurs first." *John Doe 1 v. Archdiocese of Milwaukee*, 2007 WI 95, ¶ 20, 734 N.W.2d 827, 835 (quoting *Hansen v. A.H. Robins Co.*, 335 N.W.2d 578, 583 (Wis. 1983)).

The amended complaint sets out a clear timeline of relevant events. On November 21, 2020, the Beines took P.B. to Children's Wisconsin, where he was examined by Dr. Levas and subjected to various tests, including an x-ray that Dr. Boyd interpreted. *See* Am. Compl. ¶¶ 36– 55. Hospital staff referred the potential child abuse incident to its child advocacy team, which

9

was led by APNP Lisko and APNP Bretl. *See id.* ¶¶ 45–47, 60–62. Based on her review of the available medical records, Lisko concluded that P.B. had been physically abused, and Dr. Petska signed off on that conclusion. *See id.* ¶¶ 60–95. Hospital staff referred the matter to the police, who arrested Mr. Beine that same day at the hospital. *Id.* ¶¶ 48–59. On December 15, 2020, Mr. Beine was charged with felony child abuse. *Id.* ¶ 98.

Hospital staff also referred the matter to child protective services. *See* Am. Compl. ¶¶ 113–16. CPS examined P.B. at the hospital on November 21, 2020, and monitored the Beines for several weeks thereafter. *Id.* ¶¶ 113–19. During CPS's involvement, Ms. Beine was not allowed to see P.B. unsupervised, and Mr. Beine was prohibited from caring for or having unsupervised physical contact with P.B. Meanwhile, P.B. underwent follow-up tests on November 30, 2020, and December 14, 2020. *See id.* ¶¶ 130–32. Dr. Plunk performed a second skeletal survey on December 14 and concluded that imaging remained concerning for suspected child abuse. *Id.* ¶¶ 99–101. Based on those findings, on December 15, 2020, Lisko authored a follow-up report in which she stood by her initial assessment that P.B. had been physically abused. *Id.* ¶¶ 102–04. Again, Dr. Petska signed off on Lisko's report. *Id.* ¶ 105. After reviewing the follow-up testing, CPS determined that the allegations of physical abuse by Mr. Beine were unsubstantiated. *Id.* ¶¶ 119–24. CPS closed its investigation in January 2021.

The defendants insist that these allegations clearly establish that the Beines knew or should have known the fact and the cause of their injuries no later than January 2021, when CPS finished its investigation and determined that no child abuse had occurred; I agree. The amended complaint alleges that the defendants' unconstitutional and tortious acts caused several injuries, including the temporary deprivation of a familial relationship with P.B.,

emotional distress, the denial of career opportunities, and reputational harm stemming from the false allegation of child abuse. *See* Am. Compl. ¶¶ 208–72. According to the amended complaint, those acts inflicted a cognizable injury almost immediately: hospital staff reported suspected child abuse on November 21, 2020; Mr. Beine was arrested later that day and charged with felony child abuse on December 15, 2020; CPS placed restrictions on the Beines' interactions with their young son during its investigation, which concluded in January 2021; and, after Mr. Beine was charged, the family expended costs complying with the CPS restrictions, obtaining counsel, and attempting to seek second opinions. The Beines therefore had complete and present causes of action by the end of January 2021, at the latest.

Although the Beines concede that they "had knowledge of their injury at the time their infant son was taken away from them and Mr. Beine was arrested for felony child abuse charges," they argue that they "did not know *who and how* those injuries were caused until medical professionals reviewed P.B.'s records." Pls.' Resp. 13 (emphasis added). The Beines' statute-of-limitations argument seeks to take advantage of the so-called discovery rule, which "'tolls the statute of limitations until the plaintiff discovers or with reasonable diligence should have discovered that he or she has suffered actual damage due to wrongs committed by a particular, identified person.'" *John Doe 1*, 2007 WI 95, ¶ 21, 734 N.W.2d at 835 (quoting *Pritzlaff v. Archdiocese of Milwaukee*, 533 N.W.2d 780, 785 (Wis. 1995)). "Until that time, plaintiffs are not capable of enforcing their claims either because they do not know that they have been wronged, . . . or because they do not know the identity of the person who has wronged them." *Pritzlaff*, 533 N.W.2d at 785 (citations omitted). According to the Beines, the amended complaint alleges "several dates of discovery where information related to Defendants' misconduct and illegal acts were discovered by experts in the medical field." Pls.'

Resp. 13 (citing Am. Compl. ¶¶ 145–78). They identify three such dates: (1) April 18, 2022, when Dr. Gootnick issued her report about a potential bone disease; (2) June 8, 2022, when Dr. Sullivan issued his report about a potential bone disease; and (3) December 6, 2022, when Dr. Sorrentino issued her report and diagnosed spondylometaphseal dysplasia. *Id.* The Beines further note that the amended complaint alleges they didn't learn P.B.'s injuries were caused by his bone disorder until December 6, 2022. *Id.* (citing Am. Compl. ¶ 174).

The Beines' invocation of the discovery rule does not breathe new life into their claims. The only reasonable inference that can be drawn from the amended complaint's allegations is that, as of January 2021, the Beines knew that they had been injured by hospital staff. According to the amended complaint, the Beines brought P.B. to Children's Wisconsin on November 21, 2020, for a medical examination. That same day, CPS launched its investigation, CPS placed restrictions on the Beines' relationship with P.B., and the police arrested Mr. Beine. Hospital staff examined P.B. again on November 30, 2020, and December 14, 2020. The fact that Ms. Beine started conducting her own research shortly after her husband was charged in December 2020 shows that the Beines believed at that time that the allegations of abuse were wrong. *See* Am. Compl. ¶ 133 (alleging that Ms. Beine started doing her own research because the defendants "refused to consider alternative hypotheses related to bone disease"). Likewise, it's inconceivable that the Beines wouldn't have had access to the medical records showing who was responsible for their injuries; in fact, it appears the Beines provided those records to others when searching for a second opinion, *see id.* ¶¶ 133–78. In other words, while the information the Beines learned from medical experts in 2022 may have confirmed their belief as to the cause of P.B.'s injuries, that information did not unearth *a new injury to Mr. or Ms. Beine or a new wrongdoer. See Claypool v. Levin*, 562 N.W.2d 584, 590 (Wis.

1997) (explaining that the discovery rule "does not require that the potential plaintiff know with certainty the cause of her injury"); *Lewis v. Paul Revere Life Ins. Co.*, 80 F. Supp. 2d 978, 1006 (E.D. Wis. 2000) ("The discovery rule insures that the limitations period will not begin to run on plaintiffs who reasonably do not know or are unsure about whether they have been injured. It does not toll the beginning of the limitations period until plaintiffs have completed research into their potential causes of action for a known injury.").

Enforcing a statute of limitations is not about playing "gotcha," it is about protecting defendants and the courts from "having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise." *United States v. Kubrick,* 444 U.S. 111, 117 (1979). The plaintiffs' broad reading of the discovery rule would place almost unlimited control of the accrual of injury claims in the hands of plaintiffs, extending the life of such claims essentially indefinitely while plaintiffs seek out supportive expert opinions, which presumably could be obtained without great difficulty even years or decades after the limitations period otherwise would have expired. Such a regime would be unfair to defendants and would result in the litigation of stale claims. *Samuel v. Gov't of V.I.,* No. CIV 2002/61, 2006 WL 3613257, at *8 (D.V.I. Nov. 22, 2006) ("the appellant's argument would turn the discovery rule and the statutes of limitations on their head by permitting actions for an indefinite period of time after the actual injury, so long as an expert opinion is not obtained."); *Tripo v. Robert Wood Johnson Med. Ctr.,* 845 F. Supp. 2d 621, 629–30 (D.N.J. 2012) ("although Plaintiff may not have learned that he had a legal cause of action against Defendants until he received the expert report in March 2011, the discovery rule does not toll the accrual date until a claimant knows that he has a legal cause of action against a particular defendant.")

## CONCLUSION

Because the Beines' allegations clearly establish that they knew or should have known both the alleged injurious conduct and the identity of their wrongdoers more than three years before they filed suit, all their claims are untimely. Accordingly, for all the foregoing reasons, the court **GRANTS** the defendants' motions to dismiss the amended complaint, ECF Nos. 43 & 45, and **DENIES as moot** the defendants' motions to dismiss the original complaint, ECF Nos. 27 & 33. The clerk of court shall enter judgment that this entire action is **dismissed with prejudice** and that the Beines shall take nothing from any of the defendants by their amended complaint.

**SO ORDERED** this 8th day of January, 2026.

_____
STEPHEN C. DRIES
United States Magistrate Judge

14

Case 2:25-cv-00432-SCD   Filed 01/08/26   Page 14 of 14   Document 60